NORTHERN PIPELINE CONSTRUCTION CO. *v.*
MARATHON PIPE LINE CO. ET AL.

No. 81–150.  Argued April 27, 1982—Decided June 28, 1982*

---

*Together with No. 81–546, *United States* v. *Marathon Pipe Line Co. et al.*, also on appeal from the same court.

BRENNAN, J., announced the judgment of the Court and delivered an opinion, in which MARSHALL, BLACKMUN, and STEVENS, JJ., joined. REHNQUIST, J., filed an opinion concurring in the judgment, in which O'CONNOR, J., joined, *post,* p. 89. BURGER, C. J., filed a dissenting opinion, *post,* p. 92. WHITE, J., filed a dissenting opinion, in which BURGER, C. J., and POWELL, J., joined, *post,* p. 92.

*John L. Devney* argued the cause for appellant in No. 81–150. With him on the briefs was *Jeffrey F. Shaw. Solicitor General Lee* argued the cause for the United States in both cases. With him on the briefs were *Assistant Attorney General McGrath, Deputy Solicitor General Shapiro, Alan I. Horowitz, William Kanter,* and *Michael F. Hertz.*

*Melvin I. Orenstein* argued the cause for appellee Marathon Pipe Line Co. With him on the brief were *Charles S. Cassis, John E. Compson,* and *Kenneth J. Orlowski.†*

JUSTICE BRENNAN announced the judgment of the Court and delivered an opinion, in which JUSTICE MARSHALL, JUSTICE BLACKMUN, and JUSTICE STEVENS joined.

The question presented is whether the assignment by Congress to bankruptcy judges of the jurisdiction granted in 28 U. S. C. § 1471 (1976 ed., Supp. IV) by § 241(a) of the Bankruptcy Act of 1978 violates Art. III of the Constitution.

I

A

In 1978, after almost 10 years of study and investigation, Congress enacted a comprehensive revision of the bank-

---

†Briefs of *amici curiae* urging reversal were filed by *Louis W. Levit* for the Commercial Law League of America; and by *Helen Davis Chaitman, Joel B. Zweibel, Theodore Gewertz,* and *Peter Buscemi* for the Committee on Bankruptcy and Corporate Reorganization of the Association of the Bar of the City of New York.

*Abe Fortas, Henry F. Field, Phil C. Neal,* and *Joseph M. Berl* filed a brief for Beneficial Corp. as *amicus curiae.*

ruptcy laws. The Bankruptcy Act of 1978 (Act)[1] made significant changes in both the substantive and procedural law of bankruptcy. It is the changes in the latter that are at issue in this case.

Before the Act, federal district courts served as bankruptcy courts and employed a "referee" system. Bankruptcy proceedings were generally conducted before referees,[2] except in those instances in which the district court elected to withdraw a case from a referee. See Bkrtcy. Rule 102. The referee's final order was appealable to the district court. Bkrtcy. Rule 801. The bankruptcy courts were vested with "summary jurisdiction"—that is, with jurisdiction over controversies involving property in the actual or constructive possession of the court. And, with consent, the bankruptcy court also had jurisdiction over some "plenary" matters—such as disputes involving property in the possession of a third person.

The Act eliminates the referee system and establishes "in each judicial district, as an adjunct to the district court for such district, a bankruptcy court which shall be a court of record known as the United States Bankruptcy Court for the district." 28 U. S. C. § 151(a) (1976 ed., Supp. IV). The judges of these courts are appointed to office for 14-year terms by the President, with the advice and consent of the Senate. §§ 152, 153(a) (1976 ed., Supp IV). They are subject to removal by the "judicial council of the circuit" on account of "incompetency, misconduct, neglect of duty or physical or mental disability." § 153(b) (1976 ed., Supp. IV). In addition, the salaries of the bankruptcy judges are set by statute and are subject to adjustment under the Federal Salary Act, 2 U. S. C. §§ 351–361 (1976 ed. and Supp. IV). 28 U. S. C. § 154 (1976 ed., Supp. IV).

---

[1] Pub. L. 95–598, 92 Stat. 2549. The Act became effective October 1, 1979.

[2] Bankruptcy referees were redesignated as "judges" in 1973. Bkrtcy. Rule 901(7). For purposes of clarity, however, we refer to all judges under the old Act as "referees."

The jurisdiction of the bankruptcy courts created by the Act is much broader than that exercised under the former referee system. Eliminating the distinction between "summary" and "plenary" jurisdiction, the Act grants the new courts jurisdiction over all "civil proceedings arising under title 11 [the Bankruptcy title] or arising in or *related to* cases under title 11." 28 U. S. C. § 1471(b) (1976 ed., Supp. IV) (emphasis added).[3] This jurisdictional grant empowers bankruptcy courts to entertain a wide variety of cases involving claims that may affect the property of the estate once a petition has been filed under Title 11. Included within the bankruptcy courts' jurisdiction are suits to recover accounts, controversies involving exempt property, actions to avoid transfers and payments as preferences or fraudulent conveyances, and causes of action owned by the debtor at the time of the petition for bankruptcy. The bankruptcy courts can hear claims based on state law as well as those based on federal law. See 1 W. Collier, Bankruptcy ¶ 3.01, pp. 3–47 to 3–48 (15th ed. 1982).[4]

---

[3] Although the Act initially vests this jurisdiction in district courts, 28 U. S. C. § 1471(a) (1976 ed., Supp. IV), it subsequently provides that "[t]he bankruptcy court for the district in which a case under title 11 is commenced shall exercise *all* of the jurisdiction conferred by this section on the district courts," § 1471(c) (1976 ed., Supp. IV) (emphasis added). Thus the ultimate repository of the Act's broad jurisdictional grant is the bankruptcy courts. See 1 W. Collier, Bankruptcy ¶ 3.01, pp. 3–37, 3–44 to 3–49 (15th ed. 1982).

[4] With respect to both personal jurisdiction and venue, the scope of the Act is also expansive. Although the Act does not in terms indicate the extent to which bankruptcy judges may exercise personal jurisdiction, it has been construed to allow the constitutional maximum. See, *e. g., In re Whippany Paper Board Co.,* 15 B. R. 312, 314–315 (Bkrtcy. NJ 1981). With two exceptions not relevant here, the venue of "a proceeding arising in or related to a case under title 11 [is] in the bankruptcy court in which such case is pending." 28 U. S. C. § 1473(a) (1976 ed., Supp. IV). Furthermore, the Act permits parties to remove many kinds of actions to the bankruptcy court. Parties "may remove any claim or cause of action in a civil action, other than a proceeding before the United States Tax Court or

The judges of the bankruptcy courts are vested with all of the "powers of a court of equity, law, and admiralty," except that they "may not enjoin another court or punish a criminal contempt not committed in the presence of the judge of the court or warranting a punishment of imprisonment." 28 U. S. C. § 1481 (1976 ed., Supp. IV). In addition to this broad grant of power, Congress has allowed bankruptcy judges the power to hold jury trials, § 1480; to issue declaratory judgments, § 2201; to issue writs of habeas corpus under certain circumstances, § 2256; to issue all writs necessary in aid of the bankruptcy court's expanded jurisdiction, § 451 (1976 ed. and Supp. IV); see 28 U. S. C. § 1651; and to issue any order, process or judgment that is necessary or appropriate to carry out the provisions of Title 11, 11 U. S. C. § 105(a) (1976 ed., Supp. IV).

The Act also establishes a special procedure for appeals from orders of bankruptcy courts. The circuit council is empowered to direct the chief judge of the circuit to designate panels of three bankruptcy judges to hear appeals. 28 U. S. C. § 160 (1976 ed., Supp. IV). These panels have jurisdiction of all appeals from final judgments, orders, and decrees of bankruptcy courts, and, with leave of the panel, of interlocutory appeals. § 1482. If no such appeals panel is designated, the district court is empowered to exercise appellate jurisdiction. § 1334. The court of appeals is given jurisdiction over appeals from the appellate panels or from the district court. § 1293. If the parties agree, a direct appeal to the court of appeals may be taken from a final judgment of a bankruptcy court. § 1293(b).[5]

---

a civil action by a Government unit to enforce such governmental unit's police or regulatory power." § 1478(a) (1976 ed., Supp. IV). The bankruptcy court may, however, remand such actions "on any equitable ground"; the decision to remand or retain an action is unreviewable. § 1478(b).

[5] Although no particular standard of review is specified in the Act, the parties in the present cases seem to agree that the appropriate one is the

The Act provides for a transition period before the new provisions take full effect in April 1984. §§ 401–411, 92 Stat. 2682–2688. During the transition period, previously existing bankruptcy courts continue in existence. § 404(a), 92 Stat. 2683. Incumbent bankruptcy referees, who served 6-year terms for compensation subject to adjustment by Congress, are to serve as bankruptcy judges until March 31, 1984, or until their successors take office. § 404(b), 92 Stat. 2683.[6] During this period they are empowered to exercise essentially all of the jurisdiction and powers discussed above. See §§ 404, 405, 92 Stat. 2683–2685. See generally 1 Collier, *supra*, ¶¶ 7.04–7.05, pp. 7–23 to 7–65. The procedure for taking appeals is similar to that provided after the transition period. See § 405(c)(1), 92 Stat. 2685.[7]

## B

This case arises out of proceedings initiated in the United States Bankruptcy Court for the District of Minnesota after appellant Northern Pipeline Construction Co. (Northern) filed a petition for reorganization in January 1980. In March 1980 Northern, pursuant to the Act, filed in that court a suit against appellee Marathon Pipe Line Co. (Marathon). Appellant sought damages for alleged breaches of contract and warranty, as well as for alleged misrepresentation, coercion, and duress. Marathon sought dismissal of the suit, on the ground that the Act unconstitutionally conferred Art. III ju-

---

clearly-erroneous standard, employed in old Bankruptcy Rule 810 for review of findings of fact made by a referee. See Brief for United States 41; Tr. of Oral Arg. 27. See also *In re Rivers*, 19 B. R. 438 (Bkrtcy. ED Tenn. 1982); 1 Collier, *supra* n. 3, ¶ 3.03, p. 3–315.

[6] Under the old Bankruptcy Act, referees could be removed by the district court for "incompetency, misconduct, or neglect of duty," 11 U. S. C. § 62(b) (repealed); the same grounds for removal apply during the transition period, see § 404(d), 92 Stat. 2684.

[7] It appears, however, that during the transition period an appeal of a bankruptcy judge's decision may be taken to the district court even if an appellate panel of bankruptcy judges has been established.

dicial power upon judges who lacked life tenure and protection against salary diminution. The United States intervened to defend the validity of the statute.

The Bankruptcy Judge denied the motion to dismiss. 6 B. R. 928 (1980). But on appeal the District Court entered an order granting the motion, on the ground that "the delegation of authority in 28 U. S. C. § 1471 to the Bankruptcy Judges to try cases which are otherwise relegated under the Constitution to Article III judges" was unconstitutional. Both the United States and Northern filed notices of appeal in this Court.[8] We noted probable jurisdiction. 454 U. S. 1029 (1981).[9]

## II

### A

Basic to the constitutional structure established by the Framers was their recognition that "[t]he accumulation of all powers, legislative, executive, and judiciary, in the same hands, whether of one, a few, or many, and whether hereditary, self-appointed, or elective, may justly be pronounced the very definition of tyranny." The Federalist No. 47, p. 300 (H. Lodge ed. 1888) (J. Madison). To ensure against such tyranny, the Framers provided that the Federal Government would consist of three distinct Branches, each to exercise one of the governmental powers recognized by the Framers as inherently distinct. "The Framers regarded the checks and balances that they had built into the tripartite Federal Government as a self-executing safeguard against the encroachment or aggrandizement of one branch at the

---

[8] After Northern docketed an appeal in this Court, the District Court supplemented its order with an opinion. 12 B. R. 946, 947 (1981).

[9] Two other Bankruptcy Courts have considered the constitutionality of § 1471: The Bankruptcy Court for the District of Puerto Rico determined it to be constitutional, *In re Segarra*, 14 B. R. 870 (1981), while the Bankruptcy Court for the Eastern District of Tennessee reached the opposite conclusion, *In re Rivers, supra*.

expense of the other." *Buckley* v. *Valeo*, 424 U. S. 1, 122 (1976) *(per curiam)*.

The Federal Judiciary was therefore designed by the Framers to stand independent of the Executive and Legislature—to maintain the checks and balances of the constitutional structure, and also to guarantee that the process of adjudication itself remained impartial. Hamilton explained the importance of an independent Judiciary:

> "Periodical appointments, however regulated, or by whomsoever made, would, in some way or other, be fatal to [the courts'] necessary independence. If the power of making them was committed either to the Executive or legislature, there would be danger of an improper complaisance to the branch which possessed it; if to both, there would be an unwillingness to hazard the displeasure of either; if to the people, or to persons chosen by them for the special purpose, there would be too great a disposition to consult popularity, to justify a reliance that nothing would be consulted but the Constitution and the laws." The Federalist No. 78, p. 489 (H. Lodge ed. 1888).

The Court has only recently reaffirmed the significance of this feature of the Framers' design: "A Judiciary free from control by the Executive and Legislature is essential if there is a right to have claims decided by judges who are free from potential domination by other branches of government." *United States* v. *Will*, 449 U. S. 200, 217–218 (1980).

As an inseparable element of the constitutional system of checks and balances, and as a guarantee of judicial impartiality, Art. III both defines the power and protects the independence of the Judicial Branch. It provides that "The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish." Art. III, § 1. The inexorable command of this provision is clear and defi-

nite: The judicial power of the United States must be exercised by courts having the attributes prescribed in Art. III. Those attributes are also clearly set forth:

> "The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall, at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office." Art. III, §1.

The "good Behaviour" Clause guarantees that Art. III judges shall enjoy life tenure, subject only to removal by impeachment. *United States ex rel. Toth* v. *Quarles*, 350 U. S. 11, 16 (1955). The Compensation Clause guarantees Art. III judges a fixed and irreducible compensation for their services. *United States* v. *Will, supra*, at 218–221. Both of these provisions were incorporated into the Constitution to ensure the independence of the Judiciary from the control of the Executive and Legislative Branches of government.[10] As we have only recently emphasized, "[t]he Compensation Clause has its roots in the longstanding Anglo-American tradition of an independent Judiciary," 449 U. S., at 217, while the principle of life tenure can be traced back at least as far as the Act of Settlement in 1701, *id.*, at 218. To be sure, both principles were eroded during the late colonial period, but that departure did not escape notice and indignant rejection by the Revolutionary generation. Indeed, the guarantees eventually included

---

[10] These provisions serve other institutional values as well. The independence from political forces that they guarantee helps to promote public confidence in judicial determinations. See The Federalist No. 78 (A. Hamilton). The security that they provide to members of the Judicial Branch helps to attract well-qualified persons to the federal bench. *Ibid.* The guarantee of life tenure insulates the individual judge from improper influences not only by other branches but by colleagues as well, and thus promotes judicial individualism. See Kaufman, Chilling Judicial Independence, 88 Yale L. J. 681, 713 (1979). See generally Note, Article III Limits on Article I Courts: The Constitutionality of the Bankruptcy Court and the 1979 Magistrate Act, 80 Colum. L. Rev. 560, 583–585 (1980).

in Art. III were clearly foreshadowed in the Declaration of Independence, "which, among the injuries and usurpations recited against the King of Great Britain, declared that he had 'made judges dependent on his will alone, for the tenure of their offices, and the amount and payment of their salaries.'" *O'Donoghue* v. *United States,* 289 U. S. 516, 531 (1933). The Framers thus recognized:

> "Next to permanency in office, nothing can contribute more to the independence of the judges than a fixed provision for their support. . . . In the general course of human nature, *a power over a man's subsistence amounts to a power over his will.*" The Federalist No. 79, p. 491 (H. Lodge ed. 1888) (A. Hamilton) (emphasis in original).[11]

In sum, our Constitution unambiguously enunciates a fundamental principle—that the "judicial Power of the United States" must be reposed in an independent Judiciary. It commands that the independence of the Judiciary be jealously guarded, and it provides clear institutional protections for that independence.

### B

It is undisputed that the bankruptcy judges whose offices were created by the Bankruptcy Act of 1978 do not enjoy the protections constitutionally afforded to Art. III judges. The bankruptcy judges do not serve for life subject to their continued "good Behaviour." Rather, they are appointed for

---

[11] Further evidence of the Framers' concern for assuring the independence of the Judicial Branch may be found in the fact that the Constitutional Convention soundly defeated a proposal to allow the removal of judges by the Executive and Legislative Branches. See 2 M. Farrand, Records of the Federal Convention of 1787, pp. 428–429 (1911); P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart and Wechsler's The Federal Courts and the Federal System 7 (2d ed. 1973). Mr. Wilson, of Pennsylvania, commented that "[t]he Judges would be in a bad situation if made to depend on every gust of faction which might prevail in the two branches of our Govt." 2 Farrand, *supra,* at 429.

14-year terms, and can be removed by the judicial council of the circuit in which they serve on grounds of "incompetency, misconduct, neglect of duty, or physical or mental disability." Second, the salaries of the bankruptcy judges are not immune from diminution by Congress. See *supra*, at 53. In short, there is no doubt that the bankruptcy judges created by the Act are not Art. III judges.

That Congress chose to vest such broad jurisdiction in non-Art. III bankruptcy courts, after giving substantial consideration to the constitutionality of the Act, is of course reason to respect the congressional conclusion. See *Fullilove* v. *Klutznick*, 448 U. S. 448, 472–473 (1980) (opinion of BURGER, C. J.); *Palmore* v. *United States*, 411 U. S. 389, 409 (1973). See also *National Ins. Co.* v. *Tidewater Co.*, 337 U. S. 582, 655 (1949) (Frankfurter, J., dissenting).[12] But at the same time,

---

[12] It should be noted, however, that the House of Representatives expressed substantial doubts respecting the constitutionality of the provisions eventually included in the Act. The House Judiciary Committee and its Subcommittee on Civil and Constitutional Rights gave lengthy consideration to the constitutional issues surrounding the conferral of broad powers upon the new bankruptcy courts. The Committee, the Subcommittee, and the House as a whole initially concluded that Art. III courts were constitutionally required for bankruptcy adjudications. See H. R. 8200, 95th Cong., 1st Sess. (1977); Hearings on H. R. 31 and H. R. 32 before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 94th Cong., 2d Sess., 2081–2084 (1976); *id.*, at 2682–2706; H. R. Rep. No. 95–595, p. 39 (1977) ("Article III is the constitutional norm, and the limited circumstances in which the courts have permitted departure from the requirements of Article III are not present in the bankruptcy context"); *id.*, at 21–38; Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, Constitutional Bankruptcy Courts, 95th Cong., 1st Sess., 33 (Comm. Print No. 3, 1977) (concluding that the proposed bankruptcy courts should be established "under Article III, with all of the protection that the Framers intended for an independent judiciary"); Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, Report on Hearings on the Court Administrative Structure for Bankruptcy Cases, 95th Cong., 2d Sess., 5 (Comm. Print No. 13, 1978) (same); see generally Klee, Legislative History of the New Bankruptcy Law, 28 De Paul L. Rev. 941, 945–949, 951 (1979). The

> "[d]eciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution." *Baker* v. *Carr,* 369 U. S. 186, 211 (1962).

With these principles in mind, we turn to the question presented for decision: whether the Bankruptcy Act of 1978 violates the command of Art. III that the judicial power of the United States must be vested in courts whose judges enjoy the protections and safeguards specified in that Article.

Appellants suggest two grounds for upholding the Act's conferral of broad adjudicative powers upon judges unprotected by Art. III. First, it is urged that "pursuant to its enumerated Article I powers, Congress may establish legislative courts that have jurisdiction to decide cases to which the Article III judicial power of the United States extends." Brief for United States 9. Referring to our precedents upholding the validity of "legislative courts," appellants suggest that "the plenary grants of power in Article I permit Congress to establish non-Article III tribunals in 'specialized areas having particularized needs and warranting distinctive treatment,'" such as the area of bankruptcy law. *Ibid.,* quoting *Palmore* v. *United States, supra,* at 408. Second, appellants contend that even if the Constitution does require that this bankruptcy-related action be adjudicated in an Art. III court, the Act in fact satisfies that requirement. "Bank-

---

Senate bankruptcy bill did not provide for life tenure or a guaranteed salary, instead adopting the concept of a bankruptcy court with similarly broad powers but as an "adjunct" to an Art. III court. S. 2266, 95th Cong., 2d Sess. (1978). The bill that was finally enacted, denying bankruptcy judges the tenure and compensation protections of Art. III, was the result of a series of last-minute conferences and compromises between the managers of both Houses. See Klee, *supra,* at 952–956.

ruptcy jurisdiction was vested in the district court" of the judicial district in which the bankruptcy court is located, "and the exercise of that jurisdiction by the adjunct bankruptcy court was made subject to appeal as of right to an Article III court." Brief for United States 12. Analogizing the role of the bankruptcy court to that of a special master, appellants urge us to conclude that this "adjunct" system established by Congress satisfies the requirements of Art. III. We consider these arguments in turn.

### III

Congress did not constitute the bankruptcy courts as legislative courts.[13] Appellants contend, however, that the bankruptcy courts could have been so constituted, and that as a result the "adjunct" system in fact chosen by Congress does not impermissibly encroach upon the judicial power. In advancing this argument, appellants rely upon cases in which we have identified certain matters that "congress may or may not bring within the cognizance of [Art. III courts], as it may deem proper." *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272, 284 (1856).[14] But when properly understood, these precedents represent no broad departure from the constitutional command that the judicial power of the United States must be vested in Art. III

[13] The Act designates the bankruptcy court in each district as an "adjunct" to the district court. 28 U. S. C. § 151(a) (1976 ed., Supp. IV). Neither House of Congress concluded that the bankruptcy courts should be established as independent legislative courts. See n. 12, *supra*.

[14] At one time, this Court suggested a rigid distinction between those subjects that could be considered only in Art. III courts and those that could be considered only in legislative courts. See *Williams* v. *United States*, 289 U. S. 553 (1933). But this suggested dichotomy has not withstood analysis. See C. Wright, Law of the Federal Courts 33–35 (3d ed. 1976). Our more recent cases clearly recognize that legislative courts may be granted jurisdiction over some cases and controversies to which the Art. III judicial power might also be extended. *E. g., Palmore* v. *United States*, 411 U. S. 389 (1973). See *Glidden Co.* v. *Zdanok*, 370 U. S. 530, 549–551 (1962) (opinion of Harlan, J.).

courts.[15] Rather, they reduce to three narrow situations not subject to that command, each recognizing a circumstance in which the grant of power to the Legislative and Executive Branches was historically and constitutionally so exceptional that the congressional assertion of a power to create legislative courts was consistent with, rather than threatening to, the constitutional mandate of separation of powers. These precedents simply acknowledge that the literal command of Art. III, assigning the judicial power of the United States to courts insulated from Legislative or Executive interference, must be interpreted in light of the historical context in which the Constitution was written, and of the structural imperatives of the Constitution as a whole.

Appellants first rely upon a series of cases in which this Court has upheld the creation by Congress of non-Art. III "territorial courts." This exception from the general prescription of Art. III dates from the earliest days of the Republic, when it was perceived that the Framers intended that as to certain geographical areas, in which no State operated as sovereign, Congress was to exercise the general powers of government. For example, in *American Ins. Co.* v. *Canter*, 1 Pet. 511 (1828), the Court observed that Art. IV bestowed upon Congress alone a complete power of government over

---

[15] JUSTICE WHITE's dissent finds particular significance in the fact that Congress could have assigned all bankruptcy matters to the state courts. *Post*, at 116. But, of course, virtually all matters that might be heard in Art. III courts could also be left by Congress to state courts. This fact is simply irrelevant to the question before us. Congress has no control over state-court judges; accordingly the principle of separation of powers is not threatened by leaving the adjudication of federal disputes to such judges. See Krattenmaker, Article III and Judicial Independence: Why the New Bankruptcy Courts are Unconstitutional, 70 Geo. L. J. 297, 304–305 (1981). The Framers chose to leave to Congress the precise role to be played by the lower federal courts in the administration of justice. See Hart and Wechsler's The Federal Courts and the Federal System, *supra* n. 11, at 11. But the Framers did not leave it to Congress to define the character of those courts—they were to be independent of the political branches and presided over by judges with guaranteed salary and life tenure.

territories not within the States that constituted the United States. The Court then acknowledged Congress' authority to create courts for those territories that were not in conformity with Art. III. Such courts were

> "created in virtue of the general right of sovereignty which exists in the government, or in virtue of that clause which enables Congress to make all needful rules and regulations, respecting the territory belonging to the United States. The jurisdiction with which they are invested . . . is conferred by Congress, in the execution of those general powers which that body possesses over the territories of the United States. Although admiralty jurisdiction can be exercised in the states in those Courts, only, which are established in pursuance of the third article of the Constitution; the same limitation does not extend to the territories. In legislating for them, Congress exercises the combined powers of the general, and of a state government." 1 Pet., at 546.

The Court followed the same reasoning when it reviewed Congress' creation of non-Art. III courts in the District of Columbia. It noted that there was in the District

> "no division of powers between the general and state governments. Congress has the entire control over the district for every purpose of government; and it is reasonable to suppose, that in organizing a judicial department here, all judicial power necessary for the purposes of government would be vested in the courts of justice." *Kendall* v. *United States*, 12 Pet. 524, 619 (1838).[16]

---

[16] We recently reaffirmed the principle, expressed in these early cases, that Art. I, § 8, cl. 17, provides that Congress shall have power "[t]o exercise exclusive Legislation in all Cases whatsoever, over" the District of Columbia. *Palmore* v. *United States*, 411 U. S., at 397. See also *Wallace* v. *Adams*, 204 U. S. 415, 423 (1907) (recognizing Congress' authority to establish legislative courts to determine questions of tribal membership relevant to property claims within Indian territory); *In re Ross*, 140 U. S. 453 (1891) (same, respecting consular courts established by concession

Appellants next advert to a second class of cases—those in which this Court has sustained the exercise by Congress and the Executive of the power to establish and administer courts-martial. The situation in these cases strongly resembles the situation with respect to territorial courts: It too involves a constitutional grant of power that has been historically understood as giving the political Branches of Government extraordinary control over the precise subject matter at issue. Article I, § 8, cls. 13, 14, confer upon Congress the power "[t]o provide and maintain a Navy," and "[t]o make Rules for the Government and Regulation of the land and naval Forces." The Fifth Amendment, which requires a presentment or indictment of a grand jury before a person may be held to answer for a capital or otherwise infamous crime, contains an express exception for "cases arising in the land or naval forces." And Art. II, § 2, cl. 1, provides that "The President shall be Commander in Chief of the Army and Navy of the United States, and of the Militia of the several States, when called into the actual Service of the United States." Noting these constitutional directives, the Court in *Dynes* v. *Hoover*, 20 How. 65 (1857), explained:

> "These provisions show that Congress has the power to provide for the trial and punishment of military and naval offences in the manner then and now practiced by civilized nations; and that the power to do so is given without any connection between it and the 3d article of the Constitution defining the judicial power of the United States; indeed, that the two powers are entirely independent of each other." *Id.*, at 79.[17]

from foreign countries). See generally 1 J. Moore, J. Lucas, H. Fink, D. Weckstein, & J. Wicker, Moore's Federal Practice 46–49, 53–54 (1982). But see *Reid* v. *Covert*, 354 U. S. 1 (1957).

[17] See also *Burns* v. *Wilson*, 346 U. S. 137, 139–140 (1953). But this Court has been alert to ensure that Congress does not exceed the constitutional bounds and bring within the jurisdiction of the military courts mat-

Finally, appellants rely on a third group of cases, in which this Court has upheld the constitutionality of legislative courts and administrative agencies created by Congress to adjudicate cases involving "public rights."[18]  The "public rights" doctrine was first set forth in *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272 (1856):

> "[W]e do not consider congress can either withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty; nor, on the other hand, can it bring under the judicial power a matter which, from its nature, is not a subject for judicial determination.  At the same time there are matters, *involving public rights*, which may be presented in such form that the judicial power is capable of acting on them, and which are susceptible of judicial determination, but which congress may or may not bring within the cognizance of the courts of the United States, as it may deem proper."  *Id.*, at 284 (emphasis added).

This doctrine may be explained in part by reference to the traditional principle of sovereign immunity, which recognizes that the Government may attach conditions to its consent to be sued.  See *id.*, at 283–285; see also *Ex parte Bakelite Corp.*, 279 U. S. 438, 452 (1929).  But the public-rights doctrine also draws upon the principle of separation of powers, and a historical understanding that certain prerogatives were reserved to the political Branches of Government.  The doctrine extends only to matters arising "between the Gov-

---

ters beyond that jurisdiction, and properly within the realm of "judicial power."  See, *e. g.*, *Reid* v. *Covert, supra; United States ex rel. Toth* v. *Quarles*, 350 U. S. 11 (1955).

[18] Congress' power to create legislative courts to adjudicate public rights carries with it the lesser power to create administrative agencies for the same purpose, and to provide for review of those agency decisions in Art. III courts.  See, *e. g.*, *Atlas Roofing Co.* v. *Occupational Safety and Health Review Comm'n*, 430 U. S. 442, 450 (1977).

ernment and persons subject to its authority in connection with the performance of the constitutional functions of the executive or legislative departments," *Crowell* v. *Benson*, 285 U. S. 22, 50 (1932), and only to matters that historically could have been determined exclusively by those departments, see *Ex parte Bakelite Corp.*, *supra*, at 458. The understanding of these cases is that the Framers expected that Congress would be free to commit such matters completely to nonjudicial executive determination, and that as a result there can be no constitutional objection to Congress' employing the less drastic expedient of committing their determination to a legislative court or an administrative agency. *Crowell* v. *Benson*, *supra*, at 50.[19]

The public-rights doctrine is grounded in a historically recognized distinction between matters that could be conclusively determined by the Executive and Legislative Branches and matters that are "inherently . . . judicial." *Ex parte Bakelite Corp.*, *supra*, at 458. See *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How., at 280–282. For example, the Court in *Murray's Lessee* looked to the law of England and the States at the time the Constitution was adopted, in order to determine whether the issue presented was customarily cognizable in the courts. *Ibid.* Concluding that the matter had not traditionally been one for judicial determination, the Court perceived no bar to Congress' establishment of summary procedures, outside of Art. III courts, to collect a debt due to the Government from one of its customs agents.[20] On the same premise, the Court in *Ex*

---

[19] See *Oceanic Steam Navigation Co.* v. *Stranahan*, 214 U. S. 320, 339 (1909); Katz, Federal Legislative Courts, 43 Harv. L. Rev. 894, 915 (1930).

[20] Doubtless it could be argued that the need for independent judicial determination is greatest in cases arising between the Government and an individual. But the rationale for the public-rights line of cases lies not in political theory, but rather in Congress' and this Court's understanding of what power was reserved to the Judiciary by the Constitution as a matter of historical fact.

*parte Bakelite Corp., supra,* held that the Court of Customs
Appeals had been properly constituted by Congress as a leg-
islative court:

> "The *full* province of the court under the act creating it
> is that of determining matters arising between the Gov-
> ernment and others in the executive administration and
> application of the customs laws. . . . The appeals include
> nothing which inherently or necessarily requires judicial
> determination, but only matters the determination of
> *which may be, and at times has been, committed exclu-*
> *sively to executive officers.*" 279 U. S., at 458 (empha-
> sis added).[21]

The distinction between public rights and private rights
has not been definitively explained in our precedents.[22] Nor
is it necessary to do so in the present cases, for it suffices to
observe that a matter of public rights must at a minimum
arise "between the government and others." *Ex parte
Bakelite Corp., supra,* at 451.[23] In contrast, "the liability of

---

[21] See also *Williams* v. *United States,* 289 U. S. 553 (1933) (holding that
Court of Claims was a legislative court and that salary of a judge of that
court could therefore be reduced by Congress).

[22] *Crowell* v. *Benson,* 285 U. S. 22 (1932), attempted to catalog some of
the matters that fall within the public-rights doctrine:

"Familiar illustrations of administrative agencies created for the deter-
mination of such matters are found in connection with the exercise of the
congressional power as to interstate and foreign commerce, taxation, immi-
gration, the public lands, public health, the facilities of the post office, pen-
sions and payments to veterans." *Id.,* at 51 (footnote omitted).

[23] Congress cannot "withdraw from [Art. III] judicial cognizance *any*
matter which, *from its nature,* is the subject of a suit at the common law,
or in equity, or admiralty." *Murray's Lessee* v. *Hoboken Land & Im-
provement Co.,* 18 How. 272, 284 (1856) (emphasis added). It is thus clear
that the presence of the United States as a proper party to the proceeding
is a necessary but not sufficient means of distinguishing "private rights"
from "public rights." And it is also clear that even with respect to matters
that arguably fall within the scope of the "public rights" doctrine, the pre-
sumption is in favor of Art. III courts. See *Glidden Co.* v. *Zdanok,* 370

one individual to another under the law as defined," *Crowell v. Benson, supra,* at 51, is a matter of private rights. Our precedents clearly establish that *only* controversies in the former category may be removed from Art. III courts and delegated to legislative courts or administrative agencies for their determination. See *Atlas Roofing Co.* v. *Occupational Safety and Health Review Comm'n,* 430 U. S. 442, 450, n. 7 (1977); *Crowell* v. *Benson, supra,* at 50–51. See also Katz, Federal Legislative Courts, 43 Harv. L. Rev. 894, 917–918 (1930).[24] Private-rights disputes, on the other hand, lie at the core of the historically recognized judicial power.

In sum, this Court has identified three situations in which Art. III does not bar the creation of legislative courts. In each of these situations, the Court has recognized certain exceptional powers bestowed upon Congress by the Constitution or by historical consensus. Only in the face of such an exceptional grant of power has the Court declined to hold the authority of Congress subject to the general prescriptions of Art. III.[25]

---

U. S., at 548–549, and n. 21 (opinion of Harlan, J.). See also Currie, The Federal Courts and the American Law Institute, Part 1, 36 U. Chi. L. Rev. 1, 13–14, n. 67 (1968). Moreover, when Congress assigns these matters to administrative agencies, or to legislative courts, it has generally provided, and we have suggested that it may be required to provide, for Art. III judicial review. See *Atlas Roofing Co.* v. *Occupational Safety and Health Review Comm'n,* 430 U. S., at 455, n. 13.

[24] Of course, the public-rights doctrine does not extend to any criminal matters, although the Government is a proper party. See, *e. g., United States ex rel. Toth* v. *Quarles,* 350 U. S. 11 (1955).

[25] The "unifying principle" that JUSTICE WHITE's dissent finds lacking in all of these cases, see *post,* at 105, is to be found in the exceptional constitutional grants of power to Congress with respect to certain matters. Although the dissent is correct that these grants are not explicit in the language of the Constitution, they are nonetheless firmly established in our historical understanding of the constitutional structure. When these three exceptional grants are properly constrained, they do not threaten the Framers' vision of an independent Federal Judiciary. What clearly remains subject to Art. III are all private adjudications in federal courts

We discern no such exceptional grant of power applicable in the cases before us. The courts created by the Bankruptcy Act of 1978 do not lie exclusively outside the States of the Federal Union, like those in the District of Columbia and the Territories. Nor do the bankruptcy courts bear any resemblance to courts-martial, which are founded upon the Constitution's grant of plenary authority over the Nation's military forces to the Legislative and Executive Branches. Finally, the substantive legal rights at issue in the present action cannot be deemed "public rights." Appellants argue that a discharge in bankruptcy is indeed a "public right," similar to such congressionally created benefits as "radio station licenses, pilot licenses, or certificates for common carriers" granted by administrative agencies. See Brief for United States 34. But the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power, must be distinguished from the adjudication of state-created private rights, such as the right to recover contract damages that is at issue in this case. The former may well be a "public right," but the latter obviously is not. Appellant Northern's right to recover contract damages to augment its estate is "one of private right, that is, of the liability of one

within the States—matters from their nature subject to "a suit at common law or in equity or admiralty"—and all criminal matters, with the narrow exception of military crimes. There is no doubt that when the Framers assigned the "judicial Power" to an independent Art. III Branch, these matters lay at what they perceived to be the protected core of that power.

Although the dissent recognizes that the Framers had something important in mind when they assigned the judicial power of the United States to Art. III courts, it concludes that our cases and subsequent practice have eroded this conception. Unable to find a satisfactory theme in our precedents for analyzing these cases, the dissent rejects all of them, as well as the historical understanding upon which they were based, in favor of an ad hoc balancing approach in which Congress can essentially determine for itself whether Art. III courts are required. See *post*, at 105–116. But even the dissent recognizes that the notion that Congress rather than the Constitution should determine whether there is a need for independent federal courts cannot be what the Framers had in mind. See *post*, at 113.

individual to another under the law as defined." *Crowell* v. *Benson*, 285 U. S., at 51.[26]

Recognizing that the present cases may not fall within the scope of any of our prior cases permitting the establishment of legislative courts, appellants argue that we should recognize an additional situation beyond the command of Art. III, sufficiently broad to sustain the Act. Appellants contend that Congress' constitutional authority to establish "uniform Laws on the subject of Bankruptcies throughout the United States," Art. I, § 8, cl. 4, carries with it an inherent power to establish legislative courts capable of adjudicating "bankruptcy-related controversies." Brief for United States 14. In support of this argument, appellants rely primarily upon a quotation from the opinion in *Palmore* v. *United States*, 411 U. S. 389 (1973), in which we stated that

> "both Congress and this Court have recognized that . . . the requirements of Art. III, which are applicable where laws of national applicability and affairs of national concern are at stake, must in proper circumstances give way to accommodate plenary grants of power to Congress to legislate with respect to specialized areas having particularized needs and warranting distinctive treatment." *Id.*, 407–408.

Appellants cite this language to support their proposition that a bankruptcy court created by Congress under its Art. I

---

[26] This claim may be adjudicated in federal court on the basis of its relationship to the petition for reorganization. See *Williams* v. *Austrian*, 331 U. S. 642 (1947); *Schumacher* v. *Beeler*, 293 U. S. 367 (1934). See also *National Ins. Co.* v. *Tidewater Co.*, 337 U. S. 582, 611–613 (1949) (Rutledge, J., concurring); *Textile Workers* v. *Lincoln Mills*, 353 U. S. 448, 472 (1957) (Frankfurter, J., dissenting). Cf. *Osborn* v. *Bank of the United States*, 9 Wheat. 738 (1824). But this relationship does not transform the state-created right into a matter between the Government and the petitioner for reorganization. Even in the absence of the federal scheme, the plaintiff would be able to proceed against the defendant on the state-law contractual claims.

powers is constitutional, because the law of bankruptcy is a "specialized area," and Congress has found a "particularized need" that warrants "distinctive treatment." Brief for United States 20–33.

Appellants' contention, in essence, is that pursuant to any of its Art. I powers, Congress may create courts free of Art. III's requirements whenever it finds that course expedient. This contention has been rejected in previous cases. See, e. g., *Atlas Roofing Co.* v. *Occupational Safety and Health Review Comm'n*, 430 U. S., at 450, n. 7; *United States ex rel. Toth* v. *Quarles*, 350 U. S. 11 (1955). Although the cases relied upon by appellants demonstrate that independent courts are not required for *all* federal adjudications, those cases also make it clear that where Art. III does apply, all of the legislative powers specified in Art. I and elsewhere are subject to it. See, e. g., *Ex parte Bakelite Corp.*, 279 U. S., at 449; *United States ex rel. Toth* v. *Quarles, supra; American Ins. Co.* v. *Canter*, 1 Pet., at 546; *Murray's Lessee*, 18 How., at 284. Cf. *Crowell* v. *Benson, supra*, at 51.

The flaw in appellants' analysis is that it provides no limiting principle. It thus threatens to supplant completely our system of adjudication in independent Art. III tribunals and replace it with a system of "specialized" legislative courts. True, appellants argue that under their analysis Congress could create legislative courts pursuant only to some "specific" Art. I power, and "only when there is a particularized need for distinctive treatment." Brief for United States 22–23. They therefore assert that their analysis would not permit Congress to replace the independent Art. III Judiciary through a "wholesale assignment of federal judicial business to legislative courts." *Ibid.* But these "limitations" are wholly illusory. For example, Art. I, § 8, empowers Congress to enact laws, *inter alia*, regulating interstate commerce and punishing certain crimes. Art. I, § 8, cls. 3, 6. On appellants' reasoning Congress could provide for the adjudication of these and "related" matters by judges and

courts within Congress' exclusive control.[27]  The potential for encroachment upon powers reserved to the Judicial Branch through the device of "specialized" legislative courts is dramatically evidenced in the jurisdiction granted to the courts created by the Act before us.  The broad range of questions that can be brought into a bankruptcy court because they are "related to cases under title 11," 28 U. S. C. § 1471(b) (1976 ed., Supp. IV), see *supra*, at 54, is the clearest proof that even when Congress acts through a "specialized" court, and pursuant to only one of its many Art. I powers, appellants' analysis fails to provide any real protection against the erosion of Art. III jurisdiction by the unilateral action of the political Branches.  In short, to accept appellants' reasoning, would require that we replace the principles delineated in our precedents, rooted in history and the Constitution, with a rule of broad legislative discretion that could effectively eviscerate the constitutional guarantee of an independent Judicial Branch of the Federal Government.[28]

---

[27] Nor can appellants' analysis logically be limited to Congress' Art. I powers.  For example, appellants' reasoning relies in part upon analogy to our approval of territorial courts in *American Ins. Co.* v. *Canter*, 1 Pet. 511 (1828), and of the use of an administrative agency in *Crowell* v. *Benson*, 285 U. S. 22 (1932).  Brief for United States 15; Brief for Northern Pipeline Construction Co. 10.  In those cases the Court recognized the right of Congress to create territorial courts pursuant to the authority granted under Art. IV, § 3, cl. 2, and to create administrative tribunals to adjudicate rights in admiralty pursuant to the federal authority in Art. III, § 2, over admiralty jurisdiction.  See *American Ins. Co.* v. *Canter, supra,* at 546; *Crowell* v. *Benson, supra,* at 39.  This reliance underscores the fact that appellants offer no principled means of distinguishing between Congress' Art. I powers and any of Congress' other powers—including, for example, those conferred by the various amendments to the Constitution, *e. g.,* U. S. Const., Amdts. 13–16, 19, 23, 24, 26.

[28] JUSTICE WHITE's suggested "limitations" on Congress' power to create Art. I courts are even more transparent.  JUSTICE WHITE's dissent suggests that Art. III "should be read as expressing one value that must be balanced against competing constitutional values and legislative responsibilities," and that the Court retains the final word on how the balance is

Appellants' reliance upon *Palmore* for such broad legislative discretion is misplaced. In the context of the issue decided in that case, the language quoted from the *Palmore* opinion, *supra*, at 72, offers no substantial support for appellants' argument. *Palmore* was concerned with the courts of the District of Columbia, a unique federal enclave over which "Congress has . . . entire control . . . for every purpose of government." *Kendall* v. *United States*, 12 Pet., at 619.

---

to be struck. *Post*, at 113–114. The dissent would find the Art. III "value" accommodated where appellate review by Art. III courts is provided and where the Art. I courts are "designed to deal with issues likely to be of little interest to the political branches." *Post*, at 115. But the dissent's view that appellate review is sufficient to satisfy either the command or the purpose of Art. III is incorrect. See n. 39, *infra*. And the suggestion that we should consider whether the Art. I courts are designed to deal with issues likely to be of interest to the political Branches would undermine the validity of the adjudications performed by most of the administrative agencies, on which validity the dissent so heavily relies.

In applying its ad hoc balancing approach to the facts of this case, the dissent rests on the justification that these courts differ from standard Art. III courts because of their "extreme specialization." As noted above, "extreme specialization" is hardly an accurate description of bankruptcy courts designed to adjudicate the entire range of federal and state controversies. See *infra*, at 84–85. Moreover, the special nature of bankruptcy adjudications is in no sense incompatible with performance of such functions in a tribunal afforded the protection of Art. III. As one witness pointed out to Congress:

"Relevant to that question of need, it seems worth noting that Article III itself permits much flexibility; so long as tenure during good behavior is granted, much room exists as regards other conditions. Thus it would certainly be possible to create a special bankruptcy court under Article III and there is no reason why the judges of that court would have to be paid the same salary as district judges or any other existing judges. It would also be permissible to provide that when a judge of that court retired pursuant to statute, a vacancy for a new appointment would not automatically be created. And it would be entirely valid to specify that the judges of that court could not be assigned to sit, even temporarily, on the general district courts or courts of appeals." Hearings on H. R. 31 and H. R. 32 before the Subcommittee on Civil and Constitutional Rights of the House Committee on the Judiciary, 94th Cong., 2d Sess., 2697 (1976) (letter of Paul Mishkin).

The "plenary authority" under the District of Columbia Clause, Art. I, § 8, cl. 17, was the subject of the quoted passage and the powers granted under that Clause are obviously different in kind from the other broad powers conferred on Congress: Congress' power over the District of Columbia encompasses the *full* authority of government, and thus, necessarily, the Executive and Judicial powers as well as the Legislative. This is a power that is clearly possessed by Congress only in limited geographic areas. *Palmore* itself makes this limitation clear. The quoted passage distinguishes the congressional powers at issue in *Palmore* from those in which the Art. III command of an independent Judiciary must be honored: where "laws of national applicability and affairs of national concern are at stake." 411 U. S., at 408. Laws respecting bankruptcy, like most laws enacted pursuant to the national powers cataloged in Art. I, § 8, are clearly laws of national applicability and affairs of national concern. Thus our reference in *Palmore* to "specialized areas having particularized needs" referred only to *geographic* areas, such as the District of Columbia or territories outside the States of the Federal Union. In light of the clear commands of Art. III, nothing held or said in *Palmore* can be taken to mean that in every area in which Congress may legislate, it may also create non-Art. III courts with Art. III powers.

In sum, Art. III bars Congress from establishing legislative courts to exercise jurisdiction over all matters related to those arising under the bankruptcy laws. The establishment of such courts does not fall within any of the historically recognized situations in which the general principle of independent adjudication commanded by Art. III does not apply. Nor can we discern any persuasive reason, in logic, history, or the Constitution, why the bankruptcy courts here established lie beyond the reach of Art. III.

## IV

Appellants advance a second argument for upholding the constitutionality of the Act: that "viewed within the entire ju-

dicial framework set up by Congress," the bankruptcy court is merely an "adjunct" to the district court, and that the delegation of certain adjudicative functions to the bankruptcy court is accordingly consistent with the principle that the judicial power of the United States must be vested in Art. III courts. See Brief for United States 11–13, 37–45. As support for their argument, appellants rely principally upon *Crowell* v. *Benson,* 285 U. S. 22 (1932), and *United States* v. *Raddatz,* 447 U. S. 667 (1980), cases in which we approved the use of administrative agencies and magistrates as adjuncts to Art. III courts. Brief for United States 40–42. The question to which we turn, therefore, is whether the Act has retained "the essential attributes of the judicial power," *Crowell* v. *Benson, supra,* at 51, in Art. III tribunals.[29]

The essential premise underlying appellants' argument is that even where the Constitution denies Congress the power to establish legislative courts, Congress possesses the authority to assign certain factfinding functions to adjunct tribunals. It is, of course, true that while the power to adjudicate "private rights" must be vested in an Art. III court, see Part III, *supra,*

> "this Court has accepted factfinding by an administrative agency, . . . as an adjunct to the Art. III court, analogizing the agency to a jury or a special master and permitting it in admiralty cases to perform the function of the special master. *Crowell* v. *Benson,* 285 U. S. 22, 51–

---

[29] JUSTICE WHITE's dissent fails to distinguish between Congress' power to create adjuncts to Art. III courts, and Congress' power to create Art. I courts in limited circumstances. See *post,* at 103–104. Congress' power to create adjuncts and assign them limited adjudicatory functions is in no sense an "exception" to Art. III. Rather, such an assignment is consistent with Art. III, so long as "the essential attributes of the judicial power" are retained in the Art. III court, *Crowell* v. *Benson,* 285 U. S., at 51, and so long as Congress' adjustment of the traditional manner of adjudication can be sufficiently linked to its legislative power to define substantive rights, see *infra,* at 83–84. Cf. *Atlas Roofing Co.* v. *Occupational Safety and Health Review Comm'n,* 430 U. S., at 450, n. 7.

65 (1932)." *Atlas Roofing Co.* v. *Occupational Safety and Health Review Comm'n,* 430 U. S., at 450, n. 7.

The use of administrative agencies as adjuncts was first upheld in *Crowell* v. *Benson, supra.* The congressional scheme challenged in *Crowell* empowered an administrative agency, the United States Employees' Compensation Commission, to make initial factual determinations pursuant to a federal statute requiring employers to compensate their employees for work-related injuries occurring upon the navigable waters of the United States. The Court began its analysis by noting that the federal statute administered by the Compensation Commission provided for compensation of injured employees "irrespective of fault," and that the statute also prescribed a fixed and mandatory schedule of compensation. *Id.,* at 38. The agency was thus left with the limited role of determining "questions of fact as to the circumstances, nature, extent and consequences of the injuries sustained by the employee for which compensation is to be made." *Id.,* at 54. The agency did not possess the power to enforce any of its compensation orders: On the contrary, every compensation order was appealable to the appropriate federal district court, which had the sole power to enforce it or set it aside, depending upon whether the court determined it to be "in accordance with law" and supported by evidence in the record. *Id.,* at 44–45, 48. The Court found that in view of these limitations upon the Compensation Commission's functions and powers, its determinations were "closely analogous to findings of the amount of damages that are made, according to familiar practice, by commissioners or assessors." *Id.,* at 54. Observing that "there is no requirement that, in order to maintain the essential attributes of the judicial power, all determinations of fact in constitutional courts shall be made by judges," *id.,* at 51, the Court held that Art. III imposed no bar to the scheme enacted by Congress, *id.,* at 54.

*Crowell* involved the adjudication of congressionally created rights. But this Court has sustained the use of adjunct factfinders even in the adjudication of constitutional rights—

so long as those adjuncts were subject to sufficient control by an Art. III district court. In *United States* v. *Raddatz, supra,* the Court upheld the 1978 Federal Magistrates Act, which permitted district court judges to refer certain pretrial motions, including suppression motions based on alleged violations of constitutional rights, to a magistrate for initial determination. The Court observed that the magistrate's proposed findings and recommendations were subject to *de novo* review by the district court, which was free to rehear the evidence or to call for additional evidence. *Id.,* at 676–677, 681–683. Moreover, it was noted that the magistrate considered motions only upon reference from the district court, and that the magistrates were appointed, and subject to removal, by the district court. *Id.,* at 685 (BLACKMUN, J., concurring).[30] In short, the ultimate decisionmaking authority respecting all pretrial motions clearly remained with the district court. *Id.,* at 682. Under these circumstances, the Court held that the Act did not violate the constraints of Art. III. *Id.,* at 683–684.[31]

---

[30] Thus in *Raddatz* there was no serious threat that the exercise of the judicial power would be subject to incursion by other branches. "[T]he only conceivable danger of a 'threat' to the 'independence' of the magistrate comes from within, rather than without the judicial department." 447 U. S., at 685 (BLACKMUN, J., concurring).

[31] Appellants and JUSTICE WHITE's dissent also rely on the broad powers exercised by the bankruptcy referees immediately before the Bankruptcy Act of 1978. See *post,* at 98–103. But those particular adjunct functions, which represent the culmination of years of gradual expansion of the power and authority of the bankruptcy referee, see 1 Collier, *supra* n. 3, ¶ 1.02, have never been explicitly endorsed by this Court. In *Katchen* v. *Landy,* 382 U. S. 323 (1966), on which the dissent relies, there was no discussion of the Art. III issue. Moreover, when *Katchen* was decided the 1973 Bankruptcy Rules had not yet been adopted, and the district judge, after hearing the report of the referee, was free to "modify it or . . . reject it in whole or in part or . . . receive further evidence or . . . recommit it with instructions." General Order in Bankruptcy No. 47, 305 U. S. 702 (1939).

We note, moreover, that the 1978 Act made at least three significant changes from the bankruptcy practice that immediately preceded it. First, of course, the jurisdiction of the bankruptcy courts was "substan-

Together these cases establish two principles that aid us in determining the extent to which Congress may constitutionally vest traditionally judicial functions in non-Art. III officers. First, it is clear that when Congress creates a substantive federal right, it possesses substantial discretion to prescribe the manner in which that right may be adjudicated—including the assignment to an adjunct of some functions historically performed by judges.[32] Thus *Crowell* rec-

---

tially expanded" by the Act. H. R. Rep. No. 95-595, p. 13 (1977). Before the Act the referee had no jurisdiction, except with consent, over controversies beyond those involving property in the actual or constructive possession of the court. 11 U. S. C. § 46(b) (repealed). See *MacDonald* v. *Plymouth Trust Co.*, 286 U. S. 263, 266 (1932). It cannot be doubted that the new bankruptcy judges, unlike the referees, have jurisdiction far beyond that which can be even arguably characterized as merely incidental to the discharge in bankruptcy or a plan for reorganization. Second, the bankruptcy judges have broader powers than those exercised by the referees. See *infra*, at 84–86; H. R. Rep. No. 95-595, *supra*, at 12, and nn. 63-68. Finally, and perhaps most significantly, the relationship between the district court and the bankruptcy court was changed under the 1978 Act. Before the Act, bankruptcy referees were "subordinate adjuncts of the district courts." *Id.*, at 7. In contrast, the new bankruptcy courts are "independent of the United States district courts." *Ibid.*; 1 Collier *supra* n. 3, ¶ 1.03, p. 1–9. Before the Act, bankruptcy referees were appointed and removable only by the district court. 11 U. S. C. § 62 (repealed). And the district court retained control over the reference by his power to withdraw the case from the referee. Bkrtcy. Rule 102. Thus even at the trial stage, the parties had access to an independent judicial officer. Although Congress could still lower the salary of referees, they were not dependent on the political Branches of Government for their appointment. To paraphrase JUSTICE BLACKMUN's observation in *Raddatz*, *supra*, the primary "danger of a 'threat' to the 'independence' of the [adjunct came] from within, rather than without, the judicial department." 447 U. S., at 685 (concurring opinion).

[32] Contrary to JUSTICE WHITE's suggestion, we do not concede that "Congress may provide for initial adjudications by Art. I courts or administrative judges of all rights and duties arising under otherwise valid federal laws." See *post*, at 94. Rather we simply reaffirm the holding of *Crowell*—that Congress may assign to non-Art. III bodies some adjudica-

ognized that Art. III does not require "all determinations of fact [to] be made by judges," 285 U. S., at 51; with respect to congressionally created rights, some factual determinations may be made by a specialized factfinding tribunal designed by Congress, without constitutional bar, *id.*, at 54. Second, the functions of the adjunct must be limited in such a way that "the essential attributes" of judicial power are retained in the Art. III court. Thus in upholding the adjunct scheme challenged in *Crowell*, the Court emphasized that "the reservation of full authority to the court to deal with matters of law provides for the appropriate exercise of the judicial function in this class of cases." *Ibid.* And in refusing to invalidate the Magistrates Act at issue in *Raddatz*, the Court stressed that under the congressional scheme "'[t]he authority—and the responsibility—to make an informed, final determination . . . remains with the judge,'" 447 U. S., at 682, quoting *Mathews* v. *Weber*, 423 U. S. 261, 271 (1976); the statute's delegation of power was therefore permissible, since "the ultimate decision is made by the district court," 447 U. S., at 683.

These two principles assist us in evaluating the "adjunct" scheme presented in these cases. Appellants assume that Congress' power to create "adjuncts" to consider all cases related to those arising under Title 11 is as great as it was in the circumstances of *Crowell*. But while *Crowell* certainly endorsed the proposition that Congress possesses broad discretion to assign factfinding functions to an adjunct created to aid in the adjudication of congressionally created statutory rights, *Crowell* does not support the further proposition necessary to appellants' argument—that Congress possesses the same degree of discretion in assigning traditionally judicial power to adjuncts engaged in the adjudication of rights *not*

tory functions. *Crowell* itself spoke of "specialized" functions. These cases do not require us to specify further any limitations that may exist with respect to Congress' power to create adjuncts to assist in the adjudication of federal statutory rights.

created by Congress. Indeed, the validity of this proposition was expressly denied in *Crowell*, when the Court rejected "the untenable assumption that the constitutional courts may be deprived in all cases of the determination of facts upon evidence even though a *constitutional* right may be involved," 285 U. S., at 60–61 (emphasis added),[33] and stated that

> "the essential independence of the exercise of the judicial power of the United States in the enforcement of *constitutional* rights requires that the Federal court should determine . . . an issue [of agency jurisdiction] upon its own record and the facts elicited before it." *Id.*, at 64 (emphasis added).[34]

Appellants' proposition was also implicitly rejected in *Raddatz*. Congress' assignment of adjunct functions under the Federal Magistrates Act was substantially narrower than under the statute challenged in *Crowell*. Yet the Court's scrutiny of the adjunct scheme in *Raddatz*—which played a

---

[33] The Court in *Crowell* found that the requirement of *de novo* review as to certain facts was not "simply the question of due process in relation to notice and hearing," but was "rather a question of the appropriate maintenance of the Federal judicial power." 285 U. S., at 56. The dissent agreed that some factual findings cannot be made by adjuncts, on the ground that "under certain circumstances, the constitutional requirement of due process is a requirement of [Art. III] judicial process." *Id.*, at 87 (Brandeis, J., dissenting).

[34] *Crowell*'s precise holding, with respect to the review of "jurisdictional" and "constitutional" facts that arise within ordinary administrative proceedings, has been undermined by later cases. See *St. Joseph Stock Yards Co.* v. *United States*, 298 U. S. 38, 53 (1936). See generally 4 K. Davis, Administrative Law Treatise §§ 29.08, 29.09 (1st ed. 1958). But the general principle of *Crowell*—distinguishing between congressionally created rights and constitutionally recognized rights—remains valid, as evidenced by the Court's recent approval of *Ng Fung Ho* v. *White*, 259 U. S. 276 (1922), on which *Crowell* relied. See *Agosto* v. *INS*, 436 U. S. 748, 753 (1978) (*de novo* judicial determination required for claims of American citizenship in deportation proceedings). See also *United States* v. *Raddatz*, 447 U. S., at 682–684; *id.*, at 707–712 (MARSHALL, J., dissenting).

role in the adjudication of *constitutional* rights—was far stricter than it had been in *Crowell*. Critical to the Court's decision to uphold the Magistrates Act was the fact that the ultimate decision was made by the district court. 447 U. S., at 683.

Although *Crowell* and *Raddatz* do not explicitly distinguish between rights created by Congress and other rights, such a distinction underlies in part *Crowell's* and *Raddatz'* recognition of a critical difference between rights created by federal statute and rights recognized by the Constitution. Moreover, such a distinction seems to us to be necessary in light of the delicate accommodations required by the principle of separation of powers reflected in Art. III. The constitutional system of checks and balances is designed to guard against "encroachment or aggrandizement" by Congress at the expense of the other branches of government. *Buckley* v. *Valeo*, 424 U. S., at 122. But when Congress creates a statutory right, it clearly has the discretion, in defining that right, to create presumptions, or assign burdens of proof, or prescribe remedies; it may also provide that persons seeking to vindicate that right must do so before particularized tribunals created to perform the specialized adjudicative tasks related to that right.[35] Such provisions do, in a sense, affect the exercise of judicial power, but they are also incidental to Congress' power to define the right that it has created. No

---

[35] Drawing the line between permissible extensions of legislative power and impermissible incursions into judicial power is a delicate undertaking, for the powers of the Judicial and Legislative Branches are often overlapping. As Justice Frankfurter noted in a similar context: "To be sure the content of the three authorities of government is not to be derived from an abstract analysis. The areas are partly interacting, not wholly disjointed." *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U. S. 579, 610 (1952) (concurring opinion). The interaction between the Legislative and Judicial Branches is at its height where courts are adjudicating rights wholly of Congress' creation. Thus where Congress creates a substantive right, pursuant to one of its broad powers to make laws, Congress may have something to say about the proper manner of adjudicating that right.

comparable justification exists, however, when the right being adjudicated is not of congressional creation. In such a situation, substantial inroads into functions that have traditionally been performed by the Judiciary cannot be characterized merely as incidental extensions of Congress' power to define rights that it has created. Rather, such inroads suggest unwarranted encroachments upon the judicial power of the United States, which our Constitution reserves for Art. III courts.

We hold that the Bankruptcy Act of 1978 carries the possibility of such an unwarranted encroachment. Many of the rights subject to adjudication by the Act's bankruptcy courts, like the rights implicated in *Raddatz*, are not of Congress' creation. Indeed, the cases before us, which center upon appellant Northern's claim for damages for breach of contract and misrepresentation, involve a right created by *state* law, a right independent of and antecedent to the reorganization petition that conferred jurisdiction upon the Bankruptcy Court.[36] Accordingly, Congress' authority to control the manner in which that right is adjudicated, through assignment of historically judicial functions to a non-Art. III "adjunct," plainly must be deemed at a minimum. Yet it is equally plain that Congress has vested the "adjunct" bankruptcy judges with powers over Northern's state-created right that far exceed the powers that it has vested in administrative agencies that adjudicate only rights of Congress' own creation.

Unlike the administrative scheme that we reviewed in *Crowell*, the Act vests all "essential attributes" of the judicial

---

[36] Of course, bankruptcy adjudications themselves, as well as the manner in which the rights of debtors and creditors are adjusted, are matters of federal law. Appellant Northern's state-law contract claim is now in federal court because of its relationship to Northern's reorganization petition. See n. 26, *supra*. But Congress has not purported to prescribe a rule of decision for the resolution of Northern's contractual claims.

power of the United States in the "adjunct" bankruptcy court. First, the agency in *Crowell* made only specialized, narrowly confined factual determinations regarding a particularized area of law. In contrast, the subject-matter jurisdiction of the bankruptcy courts encompasses not only traditional matters of bankruptcy, but also "all civil proceedings arising under title 11 or arising in or *related to* cases under title 11." 28 U. S. C. § 1471(b) (1976 ed., Supp. IV) (emphasis added). Second, while the agency in *Crowell* engaged in statutorily channeled factfinding functions, the bankruptcy courts exercise "*all* of the jurisdiction" conferred by the Act on the district courts, § 1471(c) (emphasis added). Third, the agency in *Crowell* possessed only a limited power to issue compensation orders pursuant to specialized procedures, and its orders could be enforced only by order of the district court. By contrast, the bankruptcy courts exercise all ordinary powers of district courts, including the power to preside over jury trials, 28 U. S. C. § 1480 (1976 ed., Supp. IV), the power to issue declaratory judgments, § 2201, the power to issue writs of habeas corpus, § 2256, and the power to issue any order, process, or judgment appropriate for the enforcement of the provisions of Title 11, 11 U. S. C. § 105(a) (1976 ed., Supp. IV).[37] Fourth, while orders issued by the agency in *Crowell* were to be set aside if "not supported by the evidence," the judgments of the bankruptcy courts are apparently subject to review only under the more deferential "clearly erroneous" standard. See n. 5, *supra*. Finally, the agency in *Crowell* was required by law to seek enforcement of its compensation orders in the district court. In contrast, the bankruptcy courts issue final judgments, which are bind-

---

[37] The limitations that the judges "may not enjoin another court or punish a criminal contempt not committed in the presence of the judge of the court or warranting a punishment of imprisonment," 28 U. S. C. § 1481 (1976 ed., Supp. IV), are also denied to Art. III judges under certain circumstances. See 18 U. S. C. §§ 401, 402, 3691; 28 U. S. C. § 2283.

ing and enforceable even in the absence of an appeal.[38]    In short, the "adjunct" bankruptcy courts created by the Act exercise jurisdiction behind the facade of a grant to the district courts, and are exercising powers far greater than those lodged in the adjuncts approved in either *Crowell* or *Raddatz*.[39]

---

[38] Although the entry of an enforcement order is in some respects merely formal, it has long been recognized that

"'[t]he award of execution . . . is a part, and an essential part of every judgment passed by a court exercising judicial power.    It is no judgment in the legal sense of the term, without it.'"    *ICC* v. *Brimson*, 154 U. S. 447, 484 (1894), quoting Chief Justice Taney's memorandum in *Gordon* v. *United States*, 117 U. S. 697, 702 (1864).

[39] Appellants suggest that *Crowell* and *Raddatz* stand for the proposition that Art. III is satisfied so long as some degree of appellate review is provided.    But that suggestion is directly contrary to the text of our Constitution: "The Judges, *both* of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall . . . receive [undiminished] Compensation." Art. III, § 1 (emphasis added).    Our precedents make it clear that the constitutional requirements for the exercise of the judicial power must be met at all stages of adjudication, and not only on appeal, where the court is restricted to considerations of law, as well as the nature of the case as it has been shaped at the trial level.    The Court responded to a similar suggestion in *Crowell* by stating that to accept such a regime,

"would be to sap the judicial power as it exists under the Federal Constitution, and to establish a government of bureaucratic character alien to our system, wherever fundamental rights depend, as not infrequently they do depend, upon the facts, and finality as to facts becomes in effect finality in law." 285 U. S., at 57.

Cf. *Ward* v. *Village of Monroeville*, 409 U. S. 57, 61–62 (1972); *Osborn* v. *Bank of the United States*, 9 Wheat. 738, 883 (1824).

JUSTICE WHITE's dissent views the function of the Third Branch as interpreting the Constitution in order to keep the other two Branches in check, and would accordingly find the purpose, if not the language, of Art. III satisfied where there is an appeal to an Art. III court.    See *post*, at 115. But in the Framers' view, Art. III courts would do a great deal more than, in an abstract way, announce guidelines for the other two Branches. While "expounding" the Constitution was surely one vital function of the Art. III courts in the Framers' view, the tasks of those courts, for which independence was an important safeguard, included the mundane as well

We conclude that 28 U. S. C. § 1471 (1976 ed., Supp. IV), as added by § 241(a) of the Bankruptcy Act of 1978, has impermissibly removed most, if not all, of "the essential attributes of the judicial power" from the Art. III district court, and has vested those attributes in a non-Art. III adjunct. Such a grant of jurisdiction cannot be sustained as an exercise of Congress' power to create adjuncts to Art. III courts.

## V

Having concluded that the broad grant of jurisdiction to the bankruptcy courts contained in 28 U. S. C. § 1471 (1976 ed., Supp. IV) is unconstitutional, we must now determine whether our holding should be applied retroactively to the effective date of the Act.[40]  Our decision in *Chevron*

---

as the glamorous, matters of common law and statute as well as constitutional law, issues of fact as well as issues of law.   As Hamilton noted, "it is not with a view to infractions of the Constitution only, that the independence of the judges may be an essential safeguard against the effects of occasional ill humors in the society."   The Federalist No. 78, p. 488 (H. Lodge ed. 1888).   In order to promote the independence and improve the quality of federal judicial decisionmaking in all of these areas, the Framers created a system of independent federal courts.   See The Federalist Nos. 78–82.

[40] It is clear that, at the least, the new bankruptcy judges cannot constitutionally be vested with jurisdiction to decide this state-law contract claim against Marathon.   As part of a comprehensive restructuring of the bankruptcy laws, Congress has vested jurisdiction over this and all matters related to cases under Title 11 in a single non-Art. III court, and has done so pursuant to a single statutory grant of jurisdiction.   In these circumstances we cannot conclude that if Congress were aware that the grant of jurisdiction could not constitutionally encompass this and similar claims, it would simply remove the jurisdiction of the bankruptcy court over these matters, leaving the jurisdictional provision and adjudicatory structure intact with respect to other types of claims, and thus subject to Art. III constitutional challenge on a claim-by-claim basis.   Indeed, we note that one of the express purposes of the Act was to ensure adjudication of all claims in a single forum and to avoid the delay and expense of jurisdictional disputes.   See H. R. Rep. No. 95–595, pp. 43–48 (1977); S. Rep. No. 95–989, p. 17 (1978).   Nor can we assume, as THE CHIEF JUSTICE suggests, *post,*

*Oil Co.* v. *Huson*, 404 U. S. 97 (1971), sets forth the three considerations recognized by our precedents as properly bearing upon the issue of retroactivity. They are, first, whether the holding in question "decid[ed] an issue of first impression whose resolution was not clearly foreshadowed" by earlier cases, *id.*, at 106; second, "whether retrospective operation will further or retard [the] operation" of the holding in question, *id.*, at 107; and third, whether retroactive application "could produce substantial inequitable results" in individual cases, *ibid.* In the present cases, all of these considerations militate against the retroactive application of our holding today. It is plain that Congress' broad grant of judicial power to non-Art. III bankruptcy judges presents an unprecedented question of interpretation of Art. III. It is equally plain that retroactive application would not further the operation of our holding, and would surely visit substantial injustice and hardship upon those litigants who relied upon the Act's vesting of jurisdiction in the bankruptcy courts. We hold, therefore, that our decision today shall apply only prospectively.[41]

The judgment of the District Court is affirmed. However, we stay our judgment until October 4, 1982. This limited stay will afford Congress an opportunity to reconstitute the bankruptcy courts or to adopt other valid means of adjudication, without impairing the interim administration of the bankruptcy laws. See *Buckley* v. *Valeo*, 424 U. S., at 143;

---

at 92, that Congress' choice would be to have these cases "routed to the United States district court of which the bankruptcy court is an adjunct." We think that it is for Congress to determine the proper manner of restructuring the Bankruptcy Act of 1978 to conform to the requirements of Art. III in the way that will best effectuate the legislative purpose.

[41] See also *Buckley* v. *Valeo*, 424 U. S. 1, 142 (1976); *Chicot County Drainage Dist.* v. *Baxter State Bank*, 308 U. S. 371, 376–377 (1940); *Insurance Corp. of Ireland* v. *Compagnie des Bauxites de Guinee*, 456 U. S. 694, 702, n. 9 (1982).

cf. *Georgia* v. *United States*, 411 U. S. 526, 541 (1973); *Fortson* v. *Morris*, 385 U. S. 231, 235 (1966); *Maryland Committee for Fair Representation* v. *Tawes*, 377 U. S. 656, 675–676 (1964).

*It is so ordered.*

JUSTICE REHNQUIST, with whom JUSTICE O'CONNOR joins, concurring in the judgment.

Were I to agree with the plurality that the question presented by these cases is "whether the assignment by Congress to bankruptcy judges of the jurisdiction granted in 28 U. S. C. § 1471 (1976 ed., Supp IV) by § 241(a) of the Bankruptcy Act of 1978 violates Art. III of the Constitution," *ante*, at 52, I would with considerable reluctance embark on the duty of deciding this broad question. But appellee Marathon Pipe Line Co. has not been subjected to the full range of authority granted bankruptcy courts by § 1471. It was named as a defendant in a suit brought by appellant Northern Pipeline Construction Co. in a United States Bankruptcy Court. The suit sought damages for, *inter alia*, breaches of contract and warranty. Marathon moved to dismiss the action on the grounds that the Bankruptcy Act of 1978, which authorized the suit, violated Art. III of the Constitution insofar as it established bankruptcy judges whose tenure and salary protection do not conform to the requirements of Art. III.

With the cases in this posture, Marathon has simply been named defendant in a lawsuit about a contract, a lawsuit initiated by appellant Northern after having previously filed a petition for reorganization under the Bankruptcy Act. Marathon may object to proceeding further with this lawsuit on the grounds that if it is to be resolved by an agency of the United States, it may be resolved only by an agency which exercises "[t]he judicial power of the United States" described by Art. III of the Constitution. But resolution of

any objections it may make on this ground to the exercise of a different authority conferred on bankruptcy courts by the 1978 Act, see *ante,* at 54–55, should await the exercise of such authority.

> "This Court, as is the case with all federal courts, 'has no jurisdiction to pronounce any statute, either of a State or of the United States, void, because irreconcilable with the Constitution, except as it is called upon to adjudge the legal rights of litigants in actual controversies. In the exercise of that jurisdiction, it is bound by two rules, to which it has rigidly adhered, one, never to anticipate a question of constitutional law in advance of the necessity of deciding it; the other never to formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied.' *Liverpool, New York & Philadelphia S.S. Co.* v. *Commissioners of Emigration,* 113 U. S, 33, 39." *United States* v. *Raines,* 362 U. S. 17, 21 (1960).

Particularly in an area of constitutional law such as that of "Art. III Courts," with its frequently arcane distinctions and confusing precedents, rigorous adherence to the principle that this Court should decide no more of a constitutional question than is absolutely necessary accords with both our decided cases and with sound judicial policy.

From the record before us, the lawsuit in which Marathon was named defendant seeks damages for breach of contract, misrepresentation, and other counts which are the stuff of the traditional actions at common law tried by the courts at Westminster in 1789. There is apparently no federal rule of decision provided for any of the issues in the lawsuit; the claims of Northern arise entirely under state law. No method of adjudication is hinted, other than the traditional common-law mode of judge and jury. The lawsuit is before the Bankruptcy Court only because the plaintiff has previously filed a petition for reorganization in that court.

The cases dealing with the authority of Congress to create courts other than by use of its power under Art. III do not admit of easy synthesis. In the interval of nearly 150 years between *American Insurance Co.* v. *Canter*, 1 Pet. 511 (1828), and *Palmore* v. *United States*, 411 U. S. 389 (1973), the Court addressed the question infrequently. I need not decide whether these cases in fact support a general proposition and three tidy exceptions, as the plurality believes, or whether instead they are but landmarks on a judicial "darkling plain" where ignorant armies have clashed by night, as JUSTICE WHITE apparently believes them to be. None of the cases has gone so far as to sanction the type of adjudication to which Marathon will be subjected against its will under the provisions of the 1978 Act. To whatever extent different powers granted under that Act might be sustained under the "public rights" doctrine of *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18 How. 272 (1856), and succeeding cases, I am satisfied that the adjudication of Northern's lawsuit cannot be so sustained.

I am likewise of the opinion that the extent of review by Art. III courts provided on appeal from a decision of the bankruptcy court in a case such as Northern's does not save the grant of authority to the latter under the rule espoused in *Crowell* v. *Benson*, 285 U. S. 22 (1932). All matters of fact and law in whatever domains of the law to which the parties' dispute may lead are to be resolved by the bankruptcy court in the first instance, with only traditional appellate review by Art. III courts apparently contemplated. Acting in this manner the bankruptcy court is not an "adjunct" of either the district court or the court of appeals.

I would, therefore, hold so much of the Bankruptcy Act of 1978 as enables a Bankruptcy Court to entertain and decide Northern's lawsuit over Marathon's objection to be violative of Art. III of the United States Constitution. Because I agree with the plurality that this grant of authority is not readily severable from the remaining grant of authority to

bankruptcy courts under § 1471, see *ante*, at 87–88, n. 40, I concur in the judgment. I also agree with the discussion in Part V of the plurality opinion respecting retroactivity and the staying of the judgment of this Court.

CHIEF JUSTICE BURGER, dissenting.

I join JUSTICE WHITE's dissenting opinion, but I write separately to emphasize that, notwithstanding the plurality opinion, the Court does *not* hold today that Congress' broad grant of jurisdiction to the new bankruptcy courts is generally inconsistent with Art. III of the Constitution. Rather, the Court's holding is limited to the proposition stated by JUSTICE REHNQUIST in his concurrence in the judgment—that a "traditional" state common-law action, not made subject to a federal rule of decision, and related only peripherally to an adjudication of bankruptcy under federal law, must, absent the consent of the litigants, be heard by an "Art. III court" if it is to be heard by any court or agency of the United States. This limited holding, of course, does not suggest that there is something inherently unconstitutional about the new bankruptcy courts; nor does it preclude such courts from adjudicating all but a relatively narrow category of claims "arising under" or "arising in or related to cases under" the Bankruptcy Act.

It will not be necessary for Congress, in order to meet the requirements of the Court's holding, to undertake a radical restructuring of the present system of bankruptcy adjudication. The problems arising from today's judgment can be resolved simply by providing that ancillary common-law actions, such as the one involved in these cases, be routed to the United States district court of which the bankruptcy court is an adjunct.

JUSTICE WHITE, with whom THE CHIEF JUSTICE and JUSTICE POWELL join, dissenting.

Article III, § 1, of the Constitution is straightforward and uncomplicated on its face:

"The judicial Power of the United States, shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish. The Judges, both of the supreme and inferior Courts, shall hold their Offices during good Behaviour, and shall at stated Times, receive for their Services, a Compensation, which shall not be diminished during their Continuance in Office."

Any reader could easily take this provision to mean that although Congress was free to establish such lower courts as it saw fit, any court that it did establish would be an "inferior" court exercising "judicial Power of the United States" and so must be manned by judges possessing both life tenure and a guaranteed minimal income. This would be an eminently sensible reading and one that, as the plurality shows, is well founded in both the documentary sources and the political doctrine of separation of powers that stands behind much of our constitutional structure. *Ante*, at 57–60.

If this simple reading were correct and we were free to disregard 150 years of history, these would be easy cases and the plurality opinion could end with its observation that "[i]t is undisputed that the bankruptcy judges whose offices were created by the Bankruptcy Act of 1978 do not enjoy the protections constitutionally afforded to Art. III judges." *Ante*, at 60. The fact that the plurality must go on to deal with what has been characterized as one of the most confusing and controversial areas of constitutional law[1] itself indicates the gross oversimplification implicit in the plurality's claim that "our Constitution unambiguously enunciates a fundamental principle—that the 'judicial Power of the United States' must be reposed in an independent Judiciary [and] provides clear institutional protections for that independence." *Ibid.* While this is fine rhetoric, analytically it serves only to put a distracting and superficial gloss on a difficult question.

---

[1] *Glidden Co.* v. *Zdanok*, 370 U. S. 530, 534 (1962) (plurality opinion of Harlan, J.).

That question is what limits Art. III places on Congress' ability to create adjudicative institutions designed to carry out federal policy established pursuant to the substantive authority given Congress elsewhere in the Constitution. Whether fortunate or unfortunate, at this point in the history of constitutional law that question can no longer be answered by looking only to the constitutional text. This Court's cases construing that text must also be considered. In its attempt to pigeonhole these cases, the plurality does violence to their meaning and creates an artificial structure that itself lacks coherence.

## I

There are, I believe, two separate grounds for today's decision. First, non-Art. III judges, regardless of whether they are labeled "adjuncts" to Art. III courts or "Art. I judges," may consider only controversies arising out of federal law. Because the immediate controversy in these cases—Northern Pipeline's claim against Marathon—arises out of state law, it may only be adjudicated, within the federal system, by an Art. III court.[2] Second, regardless of the source of law that governs the controversy, Congress is prohibited by Art. III from establishing Art. I courts, with three narrow exceptions. Adjudication of bankruptcy proceedings does not fall within any of these exceptions. I shall deal with the first of these contentions in this section.

The plurality concedes that Congress may provide for initial adjudications by Art. I courts or administrative judges of all rights and duties arising under otherwise valid federal laws. *Ante,* at 80. There is no apparent reason why this principle should not extend to matters arising in federal bankruptcy proceedings. The plurality attempts to escape the reach of prior decisions by contending that the bankrupt's claim against Marathon arose under state law. Non-Article III

---

[2] Because this is the sole ground relied upon by the Justices concurring in the judgment this is the effective basis for today's decision.

judges, in its view, cannot be vested with authority to adjudicate such issues. It then proceeds to strike down 28 U. S. C. § 1471 (1976 ed., Supp. IV) on this ground. For several reasons, the Court's judgment is unsupportable.

First, clearly this ground alone cannot support the Court's invalidation of § 1471 on its face. The plurality concedes that in adjudications and discharges in bankruptcy, "the restructuring of debtor-creditor relations, which is at the core of the federal bankruptcy power," *ante*, at 71, and "the manner in which the rights of debtors and creditors are adjusted," *ante*, at 84, n. 36, are matters of federal law. Under the plurality's own interpretation of the cases, therefore, these matters could be heard and decided by Art. I judges. But because the bankruptcy judge is also given authority to hear a case like that of appellant Northern against Marathon, which the Court says is founded on state law, the Court holds that the section must be stricken down on its face. This is a grossly unwarranted emasculation of the scheme Congress has adopted. Even if the Court is correct that such a state-law claim cannot be heard by a bankruptcy judge, there is no basis for doing more than declaring the section unconstitutional as applied to the claim against Marathon, leaving the section otherwise intact. In that event, cases such as these would have to be heard by Art. III judges or by state courts—unless the defendant consents to suit before the bankruptcy judge—just as they were before the 1978 Act was adopted. But this would remove from the jurisdiction of the bankruptcy judge only a tiny fraction of the cases he is now empowered to adjudicate and would not otherwise limit his jurisdiction.[3]

---

[3] The plurality attempts to justify its sweeping invalidation of § 1471, because of its inclusion of state-law claims, by suggesting that this statutory provision is nonseverable. *Ante*, at 87–88, n. 40. The Justices concurring in the judgment specifically adopt this argument as the reason for their decision to join the judgment of the Court. The basis for the conclusion of nonseverability, however, is nothing more than a presumption: "Congress has vested juris-

Second, the distinction between claims based on state law and those based on federal law disregards the real character of bankruptcy proceedings. The routine in ordinary bankruptcy cases now, as it was before 1978, is to stay actions against the bankrupt, collect the bankrupt's assets, require creditors to file claims or be forever barred, allow or disallow claims that are filed, adjudicate preferences and fraudulent transfers, and make pro rata distributions to creditors, who will be barred by the discharge from taking further actions against the bankrupt. The crucial point to be made is that in the ordinary bankruptcy proceeding the great bulk of creditor claims are claims that have accrued under state law prior to bankruptcy—claims for goods sold, wages, rent, utilities, and the like. "[T]he word debt as used by the Act is not confined to its technical common law meaning but . . . extends to liabilities arising out of breach of contract . . . to torts . . . and to taxes owing to the United States or state or local governments." 1 W. Collier, Bankruptcy ¶ 1.14, p. 88 (14th ed. 1976). Every such claim must be filed and its validity is sub-

---

diction over this and all matters related to cases under Title 11 in a single non-Art. III court, and has done so pursuant to a single statutory grant of jurisdiction. In these circumstances we cannot conclude that if Congress were aware that the grant of jurisdiction could not constitutionally encompass this and similar claims, it would simply remove the jurisdiction of the bankruptcy court over these matters." *Ante,* at 87, n. 40. Although it is possible, as a historical matter, to find cases of this Court supporting this presumption, see, *e. g., Williams* v. *Standard Oil Co.,* 278 U. S. 235, 242 (1929), I had not thought this to be the contemporary approach to the problem of severability, particularly when dealing with federal statutes. I would follow the approach taken by the Court in *Buckley* v. *Valeo,* 424 U. S. 1, 108 (1976): " 'Unless it is evident that the Legislature would not have enacted those provisions which are within its power, independently of that which is not, the invalid part may be dropped if what is left is fully operative as a law.' " Quoting *Champlin Refining Co.* v. *Corporation Comm'n,* 286 U. S. 210, 234 (1932). This presumption seems particularly strong when Congress has already "enacted those provisions which are within its power, independently of that which is not"—*i. e.,* in the old Bankruptcy Act.

ject to adjudication by the bankruptcy court. The existence and validity of such claims recurringly depend on state law. Hence, the bankruptcy judge is constantly enmeshed in state-law issues.

The new aspect of the Bankruptcy Act of 1978, in this regard, therefore, is not the extension of federal jurisdiction to state-law claims, but its extension to particular kinds of state-law claims, such as contract cases against third parties or disputes involving property in the possession of a third person.[4] Prior to 1978, a claim of a bankrupt against a third party, such as the claim against Marathon in this case, was not within the jurisdiction of the bankruptcy judge. The old limits were based, of course, on the restrictions implicit within the concept of *in rem* jurisdiction; the new extension is based on the concept of *in personam* jurisdiction. "The bankruptcy court is given in personam jurisdiction as well as in rem jurisdiction to handle everything that arises in a bankruptcy case." H. R. Rep. No. 95–595, p. 445 (1977). The difference between the new and old Acts, therefore, is not to be found in a distinction between state-law and federal-law matters; rather, it is in a distinction between *in rem* and *in personam* jurisdiction. The majority at no place explains why this distinction should have constitutional implications.

Third, all that can be left of the majority's argument in this regard is that state-law claims adjudicated within the federal system must be heard in the first instance by Art. III judges. I shall argue below that any such attempt to distinguish Art. I from Art. III courts by the character of the controversies they may adjudicate fundamentally misunderstands the his-

---

[4] Even this is not entirely new. Under the old Act, in certain circumstances, the referee could actually adjudicate and order the payment of a claim of the bankrupt estate against another. In *Katchen* v. *Landy*, 382 U. S. 323 (1966), for example, we recognized that when a creditor files a claim, the referee is empowered to hear and decide a counterclaim against that creditor arising out of the same transaction. A similar situation could arise in adjudicating setoffs under former § 68 of the Bankruptcy Act.

torical and constitutional significance of Art. I courts. Initially, however, the majority's proposal seems to turn the separation-of-powers doctrine, upon which the majority relies, on its head: Since state-law claims would ordinarily not be heard by Art. III judges—*i. e.*, they would be heard by state judges—one would think that there is little danger of a diminution of, or intrusion upon, the power of Art. III courts, when such claims are assigned to a non-Art. III court. The plurality misses this obvious point because it concentrates on explaining how it is that federally created rights can ever be adjudicated in Art. I courts—a far more difficult problem under the separation-of-powers doctrine. The plurality fumbles when it assumes that the rationale it develops to deal with the latter problem must also govern the former problem. In fact, the two are simply unrelated and the majority never really explains the separation-of-powers problem that would be created by assigning state-law questions to legislative courts or to adjuncts of Art. III courts.

One need not contemplate the intricacies of the separation-of-powers doctrine, however, to realize that the majority's position on adjudication of state-law claims is based on an abstract theory that has little to do with the reality of bankruptcy proceedings. Even prior to the present Act, bankruptcy cases were generally referred to bankruptcy judges, previously called referees. Bkrtcy. Rule 102(a). Title 11 U. S. C. §66 described the jurisdiction of the referees. Their powers included the authority to

> "consider all petitions referred to them and make the adjudications or dismiss the petitions . . . grant, deny or revoke discharges, determine the dischargeability of debts, and render judgments thereon [and] perform such of the duties as are by this title conferred on courts of bankruptcy, including those incidental to ancillary jurisdiction, and as shall be prescribed by rules or orders of the courts of bankruptcy of their respective districts, except as herein otherwise provided."

The bankruptcy judge possessed "complete jurisdiction of the proceedings." 1 W. Collier, Bankruptcy ¶ 1.09, p. 65 (14th ed. 1976). The referee would initially hear and decide practically all matters arising in the proceedings, including the allowance and disallowance of the claims of creditors.[5] If a claim was disallowed by the bankruptcy judge and the decision was not reversed on appeal, the creditor was forever barred from further action against the bankrupt. As pointed out above, all of these matters could and usually did involve state-law issues. Initial adjudication of state-law issues by non-Art. III judges is, then, hardly a new aspect of the 1978 Act.

Furthermore, I take it that the Court does not condemn as inconsistent with Art. III the assignment of these functions—i. e., those within the summary jurisdiction of the old bankruptcy courts—to a non-Art. III judge, since, as the plurality says, they lie at the core of the federal bankruptcy power. *Ante*, at 71. They also happen to be functions that have been performed by referees or bankruptcy judges for a very long time and without constitutional objection. Indeed, we approved the authority of the referee to allow or disallow claims in *Katchen* v. *Landy*, 382 U. S. 323 (1966). There, the referee held that a creditor had received a preference and that his claim could therefore not be allowed. We agreed that the referee had the authority not only to adjudicate the existence of the preference, but also to order that the preference be disgorged. We also recognized that the referee could adjudicate counterclaims against a creditor who files his claim against the estate. The 1973 Bankruptcy Rules make similar provision. See Rule 306(c), Rule 701, and Advisory Committee Note to Rule 701, 11 U. S. C., p. 1340. Hence, if Marathon had filed a claim against the bankrupt in this case, the trustee could have filed and the bankruptcy judge

---

[5] "The judicial act of allowance or disallowance is one, of course, that is performed by the referee where the proceedings have been generally referred." 3 W. Collier, Bankruptcy ¶ 57.14, p. 229, n. 3 (14th ed. 1977).

could have adjudicated a counterclaim seeking the relief that is involved in these cases.

Of course, all such adjudications by a bankruptcy judge or referee were subject to review in the district court, on the record. See 11 U. S. C. § 67(c). Bankruptcy Rule 810, transmitted to Congress by this Court, provided that the district court "shall accept the referee's findings of fact unless they are clearly erroneous." As the plurality recognizes, *ante*, at 55, the 1978 Act provides for appellate review in Art. III courts and presumably under the same "clearly-erroneous standard." In other words, under both the old and new Acts, initial determinations of state-law questions were to be made by non-Art. III judges, subject to review by Art. III judges. Why the differences in the provisions for appeal in the two Acts are of unconstitutional dimension remains entirely unclear.

In theory and fact, therefore, I can find no basis for that part of the majority's argument that rests on the state-law character of the claim involved here. Even if, prior to 1978, the referee could not generally participate in cases aimed at collecting the assets of a bankrupt estate, he nevertheless repeatedly adjudicated issues controlled by state law. There is very little reason to strike down § 1471 on its face on the ground that it extends, in a comparatively minimal way, the referees' authority to deal with state-law questions. To do so is to lose all sense of proportion.

## II

The plurality unpersuasively attempts to bolster its case for facial invalidity by asserting that the bankruptcy courts are now "exercising powers far greater than those lodged in the adjuncts approved in either *Crowell* or *Raddatz*." *Ante*, at 86. In support of this proposition it makes five arguments in addition to the "state-law" issue. Preliminarily, I see no basis for according standing to Marathon to raise any of these additional points. The state-law objection applies to

the Marathon case. Only that objection should now be adjudicated.[6]

I also believe that the major premise of the plurality's argument is wholly unsupported: There is no explanation of why *Crowell* v. *Benson*, 285 U. S. 22 (1932), and *United States* v. *Raddatz*, 447 U. S. 667 (1980), define the outer limits of constitutional authority. Much more relevant to today's decision are, first, the practice in bankruptcy prior to 1978, which neither the majority nor any authoritative case has questioned, and, second, the practice of today's administrative agencies. Considered from this perspective, all of the plurality's arguments are unsupportable abstractions, divorced from the realities of modern practice.

The first three arguments offered by the plurality, *ante*, at 85, focus on the narrowly defined task and authority of the agency considered in *Crowell:* The agency made only "specialized, narrowly confined factual determinations" and could issue only a narrow class of orders. Regardless of whether this was true of the Compensation Board at issue in *Crowell*, it certainly was not true of the old bankruptcy courts, nor does it even vaguely resemble current administrative practice. As I have already said, general references to bankruptcy judges, which was the usual practice prior to 1978, permitted bankruptcy judges to perform almost all of the functions of a bankruptcy court. Referees or bankruptcy judges not only exercised summary jurisdiction but could also conduct adversary proceedings to

> "(1) recover money or property . . . . (2) determine the validity, priority, or extent of a lien or other interest in property, (3) sell property free of a lien or other interest for which the holder can be compelled to make a money satisfaction, (4) object to or revoke a discharge, (5) obtain an injunction, (6) obtain relief from a stay . . . (7) determine the dischargeability of a debt." Bkrtcy. Rule 701.

---

[6] On this point I am in agreement with the Justices concurring in the judgment.

Although there were some exceptions to the referees' authority, which have been removed by the 1978 Act, the additions to the jurisdiction of the bankruptcy judges were of marginal significance when examined in the light of the overall functions of those judges before and after 1978. In my view, those changes are not sufficient to work a qualitative change in the character of the bankruptcy judge.

The plurality's fourth argument fails to point to any difference between the new and old Bankruptcy Acts. While the administrative orders in *Crowell* may have been set aside by a court if "not supported by the evidence," under both the new and old Acts at issue here, orders of the bankruptcy judge are reviewed under the "clearly-erroneous standard." See Bkrtcy. Rule 810. Indeed, judicial review of the orders of bankruptcy judges is more stringent than that of many modern administrative agencies. Generally courts are not free to set aside the findings of administrative agencies, if supported by substantial evidence. But more importantly, courts are also admonished to give substantial deference to the agency's interpretation of the statute it is enforcing. No such deference is required with respect to decisions on the law made by bankruptcy judges.

Finally, the plurality suggests that, unlike the agency considered in *Crowell*, the orders of a post-1978 bankruptcy judge are final and binding even though not appealed. *Ante*, at 85–86. To attribute any constitutional significance to this, unless the plurality intends to throw into question a large body of administrative law, is strange. More directly, this simply does not represent any change in bankruptcy practice. It was hornbook law prior to 1978 that the authorized judgments and orders of referees, including turnover orders, were final and binding and res judicata unless appealed and overturned:

> "The practice before the referee should not differ from that before the judge of the court of bankruptcy and, apart from direct review within the limitation of § 39(c),

> the orders of the referee are entitled to the same presumption of validity, conclusiveness and recognition in the court of bankruptcy or other courts." 1 W. Collier, Bankruptcy ¶ 1.09, pp. 65–66 (14th ed. 1976).

Even if there are specific powers now vested in bankruptcy judges that should be performed by Art. III judges, the great bulk of their functions are unexceptionable and should be left intact. Whatever is invalid should be declared to be such; the rest of the 1978 Act should be left alone. I can account for the majority's inexplicably heavy hand in this case only by assuming that the Court has once again lost its conceptual bearings when confronted with the difficult problem of the nature and role of Art. I courts. To that question I now turn.

### III

#### A

The plurality contends that the precedents upholding Art. I courts can be reduced to three categories. First, there are territorial courts, which need not satisfy Art. III constraints because "the Framers intended that as to certain geographical areas . . . Congress was to exercise the general powers of government."[7] *Ante,* at 64. Second, there are courts-martial, which are exempt from Art. III limits because of a constitutional grant of power that has been "historically understood as giving the political Branches of Government extraordinary control over the precise subject matter at issue." *Ante,* at 66. Finally, there are those legislative courts and administrative agencies that adjudicate cases involving public rights—controversies between the Government and private parties—which are not covered by Art. III because the controversy could have been resolved by the ex-

---

[7] The majority does not explain why the constitutional grant of power over the Territories to Congress is sufficient to overcome the strictures of Art. III, but presumably not sufficient to overcome the strictures of the Presentment Clause or other executive limits on congressional authority.

ecutive alone without judicial review. See *ante*, at 68. Despite the plurality's attempt to cabin the domain of Art. I courts, it is quite unrealistic to consider these to be only three "narrow," *ante*, at 64, limitations on or exceptions to the reach of Art. III. In fact, the plurality itself breaks the mold in its discussion of "adjuncts" in Part IV, when it announces that "when Congress creates a substantive federal right, it possesses substantial discretion to prescribe the manner in which that right may be adjudicated." *Ante*, at 80. Adjudications of federal rights may, according to the plurality, be committed to administrative agencies, as long as provision is made for judicial review.

The first principle introduced by the plurality is geographical: Art. I courts presumably are not permitted within the States.[8] The problem, of course, is that both of the other exceptions recognize that Art. I courts can indeed operate within the States. The second category relies upon a new principle: Art. I courts are permissible in areas in which the Constitution grants Congress "extraordinary control over the precise subject matter." *Ante*, at 66. Preliminarily, I do not know how we are to distinguish those areas in which Congress' control is "extraordinary" from those in which it is not. Congress' power over the Armed Forces is established in Art. I, § 8, cls. 13, 14. There is nothing in those Clauses that creates congressional authority different in kind from the authority granted to legislate with respect to bankruptcy. But more importantly, in its third category, and in its treatment of "adjuncts," the plurality itself recognizes that Congress can create Art. I courts in virtually all the areas in which Congress is authorized to act, regardless of the quality of the constitutional grant of authority. At the same time,

---

[8] Had the plurality cited only the territorial courts, the principle relied on perhaps could have been the fact that power over the Territories is provided Congress in Art. IV. However, Congress' power over the District of Columbia is an Art. I power. As such, it does not seem to have any greater status than any of the other powers enumerated in Art. I, § 8.

territorial courts or the courts of the District of Columbia, which are Art. I courts, adjudicate private, just as much as public or federal, rights.

Instead of telling us what it is Art. I courts can and cannot do, the plurality presents us with a list of Art. I courts. When we try to distinguish those courts from their Art. III counterparts, we find—apart from the obvious lack of Art. III judges—a series of nondistinctions. By the plurality's own admission, Art. I courts can operate throughout the country, they can adjudicate both private and public rights, and they can adjudicate matters arising from congressional actions in those areas in which congressional control is "extraordinary." I cannot distinguish this last category from the general "arising under" jurisdiction of Art. III courts.

The plurality opinion has the appearance of limiting Art. I courts only because it fails to add together the sum of its parts. Rather than limiting each other, the principles relied upon complement each other; together they cover virtually the whole domain of possible areas of adjudication. Without a unifying principle, the plurality's argument reduces to the proposition that because bankruptcy courts are not sufficiently like any of these three exceptions, they may not be either Art. I courts or adjuncts to Art. III courts. But we need to know why bankruptcy courts cannot qualify as Art. I courts in their own right.

## B

The plurality opinion is not the first unsuccessful attempt to articulate a principled ground by which to distinguish Art. I from Art. III courts. The concept of a legislative, or Art. I, court was introduced by an opinion authored by Chief Justice Marshall. Not only did he create the concept, but at the same time he started the theoretical controversy that has ever since surrounded the concept:

> "The Judges of the Superior Courts of Florida hold their offices for four years. These Courts, then, are not constitutional Courts, in which the judicial power conferred

by the Constitution on the general government, can be deposited. They are incapable of receiving it. They are legislative Courts, created in virtue of the general right of sovereignty which exists in the government, or in virtue of that clause which enables Congress to make all needful rules and regulations, respecting the territory belonging to the United States. The jurisdiction with which they are invested, is not a part of that judicial power which is defined in the 3d article of the Constitution, but is conferred by Congress, in the execution of those general powers which that body possesses over the territories of the United States." *American Insurance Co.* v. *Canter*, 1 Pet. 511, 546 (1828).

The proposition was simple enough: Constitutional courts exercise the judicial power described in Art. III of the Constitution; legislative courts do not and cannot.

There were only two problems with this proposition. First, *Canter* itself involved a case in admiralty jurisdiction, which is specifically included within the "judicial power of the United States" delineated in Art. III. How, then, could the territorial court not be exercising Art. III judicial power? Second, and no less troubling, if the territorial courts could not exercise Art. III power, how could their decisions be subject to appellate review in Art. III courts, including this one, that can exercise only Art. III "judicial" power? Yet from early on this Court has exercised such appellate jurisdiction. *Benner* v. *Porter*, 9 How. 235, 243 (1850); *Clinton* v. *Englebrecht*, 13 Wall. 434 (1872); *Reynolds* v. *United States*, 98 U. S. 145, 154 (1879); *United States* v. *Coe*, 155 U. S. 76, 86 (1894); *Balzac* v. *Porto Rico*, 258 U. S. 298, 312–313 (1922). The attempt to understand the seemingly unexplainable was bound to generate "confusion and controversy." This analytic framework, however—the search for a principled distinction—has continued to burden the Court.

The first major elaboration on the *Canter* principle was in *Murray's Lessee* v. *Hoboken Land & Improvement Co.*, 18

How. 272 (1856). The plaintiff in that case argued that a proceeding against a customs collector for the collection of moneys claimed to be due to the United States was an exercise of "judicial power" and therefore had to be carried out by Art. III judges. The Court accepted this premise: "It must be admitted that, if the auditing of this account, and the ascertainment of its balance, and the issuing of this process, was an exercise of the judicial power of the United States, the proceeding was void; for the officers who performed these acts could exercise no part of that judicial power." *Id.*, at 275. Having accepted this premise, the Court went on to delineate those matters which could be determined only by an Art. III court, *i. e.*, those matters that fall within the nondelegable "judicial power" of the United States. The Court's response to this was twofold. First, it suggested that there are certain matters which are inherently "judicial": "[W]e do not consider congress can either withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or admiralty." *Id.*, at 284. Second, it suggested that there is another class of issues that, depending upon the form in which Congress structures the decisionmaking process, may or may not fall within "the cognizance of the courts of the United States." *Ibid.* This latter category consisted of the so-called "public rights." Apparently, the idea was that Congress was free to structure the adjudication of "public rights" without regard to Art. III.

Having accepted the plaintiff's premise, it is hard to see how the Court could have taken too seriously its first contention. The Court presented no examples of such issues that are judicial "by nature" and simply failed to acknowledge that Art. I courts already sanctioned by the Court—*e. g.*, territorial courts—were deciding such issues all the time. The second point, however, contains implicitly a critical insight; one that if openly acknowledged would have undermined the entire structure. That insight follows from the Court's earlier

recognition that the term "judicial act" is broad enough to encompass all administrative action involving inquiry into facts and the application of law to those facts. *Id.*, at 280. If administrative action can be characterized as "judicial" in nature, then obviously the Court's subsequent attempt to distinguish administrative from judicial action on the basis of the manner in which Congress structures the decision cannot succeed. There need be no Art. III court involvement in any adjudication of a "public right," which the majority now interprets as any civil matter arising between the Federal Government and a citizen. In that area, whether an issue is to be decided by an Art. III court depends, finally, on congressional intent.

Although *Murray's Lessee* implicitly undermined Chief Justice Marshall's suggestion that there is a difference in kind between the work of Art. I and that of Art. III courts, it did not contend that the Court must always defer to congressional desire in this regard. The Court considered the plaintiff's contention that removal of the issue from an Art. III court must be justified by "necessity." Although not entirely clear, the Court seems to have accepted this proposition: "[I]t seems to us that the just inference from the entire law is, that there was such a necessity for the warrant." *Id.*, at 285.[9]

The Court in *Murray's Lessee* was precisely right: Whether an issue can be decided by a non-Art. III court does not depend upon the judicial or nonjudicial character of the issue, but on the will of Congress and the reasons Congress offers for not using an Art. III court. This insight, however, was completely disavowed in the next major case to consider

---

[9] By stating that "of this necessity congress alone is the judge," 18 How., at 285, the Court added some serious ambiguity to the standard it applied. Because this statement ends the Court's analysis of the merits of the claim, it does not seem to mean that the Court will simply defer to congressional judgment. Rather, it appears to mean that the Court will review the legislative record to determine whether there appeared to Congress to be compelling reasons for not establishing an Art. III court.

the distinction between Art. I and Art. III courts, *Ex parte Bakelite Corp.*, 279 U. S. 438 (1929), in which the Court concluded that the Court of Customs Appeals was a legislative court. The Court there directly embraced the principle also articulated in *Murray's Lessee* that Art. I courts may not consider any matter "which inherently or necessarily requires judicial determination," but only such matters as are "susceptible of legislative or executive determination." 279 U. S., at 453. It then went on effectively to bury the critical insight of *Murray's Lessee*, labeling as "fallacious" any argument that "assumes that whether a court is of one class or the other depends on the intention of Congress, whereas the true test lies in the power under which the court was created and in the jurisdiction conferred." 279 U. S., at 459.[10]

The distinction between public and private rights as the principle delineating the proper domains of legislative and constitutional courts respectively received its death blow, I had believed, in *Crowell* v. *Benson*, 285 U. S. 22 (1932). In that case, the Court approved an administrative scheme for the determination, in the first instance, of maritime employee compensation claims. Although acknowledging the framework set out in *Murray's Lessee* and *Ex parte Bakelite Corp.*, the Court specifically distinguished the case before it: "The present case does not fall within the categories just described but is one of private right, that is, of the liability of one individual to another under the law as defined."[11] 285 U. S., at 51. Nevertheless, the Court approved of the use of an Art. I adjudication mechanism on the new theory that "there is no requirement that, in order to maintain the essen-

---

[10] The Court did not, however, entirely follow this principle, for it stated elsewhere that "there is propriety in mentioning the fact that Congress always has treated [the Court of Claims as an Art. I court]." 279 U. S., at 454.

[11] The plurality is clearly wrong in citing *Crowell* in support of the proposition that matters involving private, as opposed to public, rights may not be considered in a non-Art. III court. *Ante*, at 70.

tial attributes of the judicial power, all determinations of fact in constitutional courts shall be made by judges." *Ibid.* Article I courts could deal not only with public rights, but also, to an extent, with private rights. The Court now established a distinction between questions of fact and law: "[T]he reservation of full authority to the court to deal with matters of law provides for the appropriate exercise of the judicial function in this class of cases."[12] *Id.*, at 54.

Whatever sense *Crowell* may have seemed to give to this subject was exceedingly short-lived. One year later, the Court returned to this subject, abandoning both the public/private and the fact/law distinction and replacing both with a simple literalism. In *O'Donoghue* v. *United States*, 289 U. S. 516 (1933), considering the courts of the District of Columbia, and in *Williams* v. *United States*, 289 U. S. 553 (1933), considering the Court of Claims, the Court adopted the principle that if a federal court exercises jurisdiction over cases of the type listed in Art. III, § 2, as falling within the "judicial power of the United States," then that court must be an Art. III court:

> "The provision of this section of the article is that the 'judicial power shall extend' to the cases enumerated, and it logically follows that where jurisdiction over these cases is conferred upon the courts of the District, the judicial power, since they are capable of receiving it, is *ipso facto*, vested in such courts as inferior courts of the United States." *O'Donoghue, supra*, at 545.[13]

---

[12] *Crowell* also suggests that certain facts—constitutional or jurisdictional—must also be subject to *de novo* review in an Art. III court. I agree with the plurality that this aspect of *Crowell* has been "undermined by later cases," *ante*, at 82, n. 34. As a matter of historical interest, however, I would contend that *Crowell's* holding with respect to these "facts" turned more on the questions of law that were inseparably tied to them, than on some notion of the inadequacy of a non-Art. III factfinder.

[13] *O'Donoghue* does not apply this principle wholly consistently: It still recognizes a territorial court exception to Art. III's requirements. It now

In order to apply this same principle and yet hold the Court of Claims to be a legislative court, the Court found it necessary in *Williams, supra,* to conclude that the phrase "Controversies to which the United States shall be a party" in Art. III must be read as if it said "Controversies to which the United States shall be a party plaintiff or petitioner."[14]

By the time of the *Williams* decision, this area of the law was mystifying to say the least. What followed helped very little, if at all. In the next two major cases the Court could not agree internally on a majority position. In *National Insurance Co.* v. *Tidewater Co.,* 337 U. S. 582 (1949), the Court upheld a statute giving federal district courts jurisdiction over suits between citizens of the District of Columbia and citizens of a State. A majority of the Court, however, rejected the plurality position that Congress had the authority to assign Art. I powers to Art. III courts, at least outside of the District of Columbia. Only Chief Justice Vinson in dissent reflected on the other side of this problem: whether Art. I courts could be assigned Art. III powers. He entirely disagreed with the conceptual basis for *Williams* and *O'Donoghue,* noting that to the extent that Art. I courts consider non-Art. III matters, appellate review by an Art. III court would be precluded. Or conversely, since appellate review is exercised by this Court over Art. I courts, Art. I courts must "exercise federal question jurisdiction." 337 U. S., at 643. Having gone this far, the Chief Justice was confronted with the obvious question of whether in fact "the distinction between constitutional and legislative courts is meaningless." *Id.,* at 644. Although suggesting that out-

_____

bases this exception, however, not on any theoretical difference in principle, but simply on the "transitory character of the territorial governments." 289 U. S., at 536.

[14] See P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart and Wechsler's The Federal Courts and The Federal System 399 (2d ed. 1973) (reviewing the problems of the *Williams* case and characterizing it as an "intellectual disaster").

side of the Territories or the District of Columbia there may be some limits on assignment to Art. I courts of matters that fall within Art. III jurisdiction—apart from federal-question jurisdiction—for the most part the Chief Justice ended up relying on the good will of Congress: "[W]e cannot impute to Congress an intent now or in the future to transfer jurisdiction from constitutional to legislative courts for the purpose of emasculating the former." *Ibid.*

Another chapter in this somewhat dense history of a constitutional quandary was provided by Justice Harlan's plurality opinion in *Glidden Co.* v. *Zdanok,* 370 U. S. 530 (1962), in which the Court, despite *Bakelite* and *Williams*—and relying on an Act of Congress enacted since those decisions—held the Court of Claims and the Court of Customs and Patent Appeals to be Art. III courts. Justice Harlan continued the process of intellectual repudiation begun by Chief Justice Vinson in *Tidewater.* First, it was clear to him that Chief Justice Marshall could not have meant what he said in *Canter* on the inability of Art. I courts to consider issues within the jursidiction of Art. III courts: "Far from being 'incapable of receiving' federal-question jurisdiction, the territorial courts have long exercised a jurisdiction commensurate in this regard with that of the regular federal courts and have been subjected to the appellate jurisdiction of this Court precisely because they do so." 370 U. S., at 545, n. 13. Second, exceptions to the requirements of Art. III, he thought, have not been founded on any principled distinction between Art. I issues and Art. III issues; rather, a "confluence of practical considerations," *id.,* at 547, accounts for this Court's sanctioning of Art. I courts:

> "The touchstone of decision in all these cases has been the need to exercise the jurisdiction then and there and for a transitory period. Whether constitutional limitations on the exercise of judicial power have been held inapplicable has depended on the particular local setting, the practical necessities, and the possible alternatives." *Id.,* at 547–548.

Finally, recognizing that there is frequently no way to distinguish between Art. I and Art. III courts on the basis of the work they do, Justice Harlan suggested that the only way to tell them apart is to examine the "establishing legislation" to see if it complies with the requirements of Art. III. This, however, comes dangerously close to saying that Art. III courts are those with Art. III judges; Art. I courts are those without such judges. One hundred and fifty years of constitutional history, in other words, had led to a simple tautology.

## IV

The complicated and contradictory history of the issue before us leads me to conclude that Chief Justice Vinson and Justice Harlan reached the correct conclusion: There is no difference in principle between the work that Congress may assign to an Art. I court and that which the Constitution assigns to Art. III courts. Unless we want to overrule a large number of our precedents upholding a variety of Art. I courts—not to speak of those Art. I courts that go by the contemporary name of "administrative agencies"—this conclusion is inevitable. It is too late to go back that far; too late to return to the simplicity of the principle pronounced in Art. III and defended so vigorously and persuasively by Hamilton in The Federalist Nos. 78–82.

To say that the Court has failed to articulate a principle by which we can test the constitutionality of a putative Art. I court, or that there is no such abstract principle, is not to say that this Court must always defer to the legislative decision to create Art. I, rather than Art. III, courts. Article III is not to be read out of the Constitution; rather, it should be read as expressing one value that must be balanced against competing constitutional values and legislative responsibilities. This Court retains the final word on how that balance is to be struck.

Despite the principled, although largely mistaken, rhetoric expanded by the Court in this area over the years, such a balancing approach stands behind many of the decisions up-

holding Art. I courts. Justice Harlan suggested as much in *Glidden*, although he needlessly limited his consideration to the "temporary" courts that Congress has had to set up on a variety of occasions. In each of these instances, this Court has implicitly concluded that the legislative interest in creating an adjudicative institution of temporary duration outweighed the values furthered by a strict adherence to Art. III. Besides the territorial courts approved in *American Insurance Co.* v. *Canter*, 1 Pet. 511 (1828), these courts have included the Court of Private Land Claims, *United States* v. *Coe*, 155 U. S. 76 (1894), the Choctaw and Chickasaw Citizenship Court, *Stephens* v. *Cherokee Nation*, 174 U. S. 445 (1899), and consular courts established in foreign countries, *In re Ross*, 140 U. S. 453 (1891). This same sort of "practical" judgment was voiced, even if not relied upon, in *Crowell* with respect to the Employees' Compensation Claims Commission, which was not meant to be of limited duration: "[W]e are unable to find any constitutional obstacle to the action of the Congress in availing itself of a method shown by experience to be essential in order to apply its standards to the thousands of cases involved." 285 U. S., at 54. And even in *Murray's Lessee*, there was a discussion of the "necessity" of Congress' adopting an approach that avoided adjudication in an Art. III court. 18 How., at 285.

This was precisely the approach taken to this problem in *Palmore* v. *United States*, 411 U. S. 389 (1973), which, contrary to the suggestion of the plurality, did not rest on any theory of territorial or geographical control. *Ante*, at 75–76. Rather, it rested on an evaluation of the strength of the legislative interest in pursuing in this manner one of its constitutionally assigned responsibilities—a responsibility not different in kind from numerous other legislative responsibilities. Thus, *Palmore* referred to the wide variety of Art. I courts, not just territorial courts. It is in this light that the critical statement of the case must be understood:

> "[T]he requirements of Art. III, which are applicable where laws of national applicability and affairs of national concern are at stake, must in proper circumstances give way to accommodate plenary grants of power to Congress to legislate with respect to specialized areas having particularized needs and warranting distinctive treatment." 411 U. S., at 407–408.

I do not suggest that the Court should simply look to the strength of the legislative interest and ask itself if that interest is more compelling than the values furthered by Art. III. The inquiry should, rather, focus equally on those Art. III values and ask whether and to what extent the legislative scheme accommodates them or, conversely, substantially undermines them. The burden on Art. III values should then be measured against the values Congress hopes to serve through the use of Art. I courts.

To be more concrete: *Crowell, supra,* suggests that the presence of appellate review by an Art. III court will go a long way toward insuring a proper separation of powers. Appellate review of the decisions of legislative courts, like appellate review of state-court decisions, provides a firm check on the ability of the political institutions of government to ignore or transgress constitutional limits on their own authority. Obviously, therefore, a scheme of Art. I courts that provides for appellate review by Art. III courts should be substantially less controversial than a legislative attempt entirely to avoid judicial review in a constitutional court.

Similarly, as long as the proposed Art. I courts are designed to deal with issues likely to be of little interest to the political branches, there is less reason to fear that such courts represent a dangerous accumulation of power in one of the political branches of government. Chief Justice Vinson suggested as much when he stated that the Court should guard against any congressional attempt "to transfer jurisdiction

. . . for the purpose of emasculating" constitutional courts. *National Insurance Co.* v. *Tidewater Co.*, 337 U. S., at 644.

## V

I believe that the new bankruptcy courts established by the Bankruptcy Act of 1978, 28 U. S. C. § 1471 (1976 ed., Supp. IV), satisfy this standard.

First, ample provision is made for appellate review by Art. III courts. Appeals may in some circumstances be brought directly to the district courts. 28 U. S. C. § 1334 (1976 ed., Supp. IV). Decisions of the district courts are further appealable to the court of appeals. § 1293. In other circumstances, appeals go first to a panel of bankruptcy judges, § 1482, and then to the court of appeals. § 1293. In still other circumstances—when the parties agree—appeals may go directly to the court of appeals. In sum, there is in every instance a right of appeal to at least one Art. III court. Had Congress decided to assign all bankruptcy matters to the state courts, a power it clearly possesses, no greater review in an Art. III court would exist. Although I do not suggest that this analogy means that Congress may establish an Art. I court wherever it could have chosen to rely upon the state courts, it does suggest that the critical function of judicial review is being met in a manner that the Constitution suggests is sufficient.

Second, no one seriously argues that the Bankruptcy Act of 1978 represents an attempt by the political branches of government to aggrandize themselves at the expense of the third branch or an attempt to undermine the authority of constitutional courts in general. Indeed, the congressional perception of a lack of judicial interest in bankruptcy matters was one of the factors that led to the establishment of the bankruptcy courts: Congress feared that this lack of interest would lead to a failure by federal district courts to deal with bankruptcy matters in an expeditious manner. H. R. Rep. No. 95–595, p. 14 (1977). Bankruptcy matters are, for the most part, private adjudications of little political significance.

Although some bankruptcies may indeed present politically controversial circumstances or issues, Congress has far more direct ways to involve itself in such matters than through some sort of subtle, or not so subtle, influence on bankruptcy judges. Furthermore, were such circumstances to arise, the Due Process Clause might very well require that the matter be considered by an Art. III judge: Bankruptcy proceedings remain, after all, subject to all of the strictures of that constitutional provision.[15]

Finally, I have no doubt that the ends that Congress sought to accomplish by creating a system of non-Art. III bankruptcy courts were at least as compelling as the ends found to be satisfactory in *Palmore* v. *United States*, 411 U. S. 389 (1973), or the ends that have traditionally justified the creation of legislative courts. The stresses placed upon the old bankruptcy system by the tremendous increase in bankruptcy cases were well documented and were clearly a matter to which Congress could respond.[16] I do not believe it is possible to challenge Congress' further determination that it was necessary to create a specialized court to deal with bankruptcy matters. This was the nearly uniform conclusion of all those that testified before Congress on the question of reform of the bankruptcy system, as well as the conclusion of the Commission on Bankruptcy Laws established by Congress in 1970 to explore possible improvements in the system.[17]

The real question is not whether Congress was justified

---

[15] See *Crowell* v. *Benson*, 285 U. S. 22, 87 (1932) (Brandeis, J., dissenting) ("If there be any controversy to which the judicial power extends that may not be subjected to the conclusive determination of administrative bodies or federal legislative courts, it is not because of any prohibition against the diminution of the jurisdiction of the federal district courts as such, but because, under the circumstances, the constitutional requirement of due process is a requirement of judicial process").

[16] "During the past 30 years, the number of bankruptcy cases filed annually has increased steadily from 10,000 to over 254,000." H. R. Rep. No. 95–595, p. 21 (1977).

[17] See H. R. Doc. No. 93–137, pt. 1, pp. 85–96 (1973).

in establishing a specialized bankruptcy court, but rather whether it was justified in failing to create a specialized, Art. III bankruptcy court.   My own view is that the very fact of extreme specialization may be enough, and certainly has been enough in the past,[18] to justify the creation of a legislative court.   Congress may legitimately consider the effect on the federal judiciary of the addition of several hundred specialized judges: We are, on the whole, a body of generalists.[19] The addition of several hundred specialists may substantially change, whether for good or bad, the character of the federal bench.   Moreover, Congress may have desired to maintain some flexibility in its possible future responses to the general problem of bankruptcy.   There is no question that the existence of several hundred bankruptcy judges with life tenure would have severely limited Congress' future options.   Furthermore, the number of bankruptcies may fluctuate, producing a substantially reduced need for bankruptcy judges. Congress may have thought that, in that event, a bankruptcy specialist should not as a general matter serve as a judge in the countless nonspecialized cases that come before the federal district courts.   It would then face the prospect of large numbers of idle federal judges.   Finally, Congress may have believed that the change from bankruptcy referees to Art. I judges was far less dramatic, and so less disruptive of the existing bankruptcy and constitutional court systems, than would be a change to Art. III judges.

For all of these reasons, I would defer to the congressional judgment.   Accordingly, I dissent.

---

[18] Consider, for example, the Court of Customs Appeals involved in *Ex parte Bakelite Corp.*, 279 U. S. 438 (1929), or the variety of specialized administrative agencies that engage in some form of adjudication.

[19] In 1977, there were approximately 190 full-time and 30 part-time bankruptcy judges throughout the country.   H. R. Rep. No. 95–595, at 9.