**In re, JOE GIBSON'S AUTO WORLD, INC., Debtors.**

**Joe Gibson's Auto World, Inc., Plaintiff,**

**v.**

**Zurich American Insurance Company, Defendant.**

**Bankruptcy No. 08–04215–HB.**
**Adversary No. 09–80052–HB.**

United States Bankruptcy Court, D. South Carolina.

Sept. 30, 2009.

G. William McCarthy, Jr., Columbia, SC, Harry C. Walker, Jr., Walker and Reibold, LLC, Columbia, SC, for Debtors.

## ORDER

HELEN E. BURRIS, Bankruptcy Judge.

This matter came before the Court for hearing on the Motion of Zurich American Insurance Company [1] ("Defendant"), filed pursuant to 28 U.S.C. § 157(b)(3). That Motion requests a hearing on whether the matters raised in this adversary proceeding are core matters as defined in § 157(b)(2). The relevant allegations set forth in the adversary pleadings are as follows:

### The Complaint

The Complaint was filed on April 1, 2009. Joe Gibson's Auto World, Inc., ("Plaintiff") is the debtor in related Chapter 11 case 08–04215. Plaintiff asserts that this is a core proceeding pursuant to § 157(b)(2), including subparts (A), (E), and (O).

Plaintiff alleges that this lawsuit is brought on behalf of the bankruptcy estate, the debtor and its creditors and claimants. It alleges that Plaintiff and Defendant were parties to pre-petition contracts of insurance labeled by Plaintiff as the "Umbrella Policy" in effect to provide insurance coverage to Plaintiff for the period of November 1, 2006, through November 1, 2008.

The Complaint alleges that during the policy period Plaintiff was engaged in the business of selling motor vehicles. Individuals who purchased vehicles from Plaintiff ("Consumers Claimants") during the policy period filed suit against Plaintiff and others, alleging various causes of action, including negligence, unfair trade practices, and indemnification. The Complaint alleges that upon information and belief these claims are covered by the Umbrella Policy and that Plaintiff timely reported all claims to Defendant and Defendant assumed defense of many claims and parts of claims, but has denied other claims and other parts of claims.

The Complaint alleges that on about September 18, 2008, Plaintiff put Defendant on notice of its responsibilities and contractual obligations under the Umbrella Policy. The Complaint alleges that on

---

**1.** The Answer filed by Defendant dated May 5, 2009, states that Defendant is incorrectly identified and that the document is signed by counsel for "Defendant Universal Underwriters Insurance Company (Incorrectly Identified as Zurich American Insurance Company)." However, no change to the caption or parties has been made.

September 23, 2008, Defendant issued a letter denying any liability under the Umbrella Policy and denying any liability to defend or to attempt to settle with the Consumer Claimants (the "September 2008 Letter").

Plaintiff alleges that Defendant has failed to honor its obligations under the Umbrella Policy and that in order to mitigate damages, Plaintiff reached a settlement with the Consumer Claimants and other parties in this bankruptcy case and as a result Plaintiff may incur liability to other parties whose funds may be utilized to aid in that settlement. Plaintiff further alleges that those other parties may then have indemnification claims against Plaintiff for which Defendant is responsible.

Plaintiff demands that Defendant "compensate Plaintiff and those who should be covered by Plaintiff's polices ... for their losses. . . ." Plaintiff alleges that because of Defendant's "bad faith refusal to participate in the process of resolving a valid insurance claim, and as a direct and proximate result thereof, Plaintiff and those in privity with Plaintiff have been damaged in that they have been forced to incur liabilities and pay or promise to pay various sums to resolve the claims which should have been resolved in whole or in part" by Defendant and asks the Court to "award damages to Plaintiff or to a common fund for use by Plaintiff and Plaintiff's claimants and those in privity with Plaintiff or who have otherwise paid, will pay, or have agreed to pay to help mitigate Plaintiff's injuries. . . ."

Plaintiff states causes of action for breach of contract, bad faith refusal to pay a claim, and asks for a declaratory judgment finding the claims of the Consumer Claimants are covered by the policy.

Plaintiff's Complaint demands a jury trial, and counsel for Plaintiff renewed this request at the hearing on this matter.[2]

### The Answer and Counterclaim

Defendant's Amended Answer denies that this is a core proceeding. Defendant answers that it entered into mutually binding insurance contracts with Plaintiff, one of which was an Umbrella Policy. Defendant answers that it has honored its obligation under any and all policies by providing a defense to Plaintiff under a full reservation of rights and has also made a substantial contribution to a Global Settlement Agreement ("GSA")[3] reached in the bankruptcy case. Defendant denies that the Consumer Claimant's claims are covered by the insurance policies. Universal specifically denies that any of the claims were covered by the Umbrella Policy. Defendant admits that it received a letter on behalf of Plaintiff giving it "notice of various claims under the Umbrella Policy dated September 18, 2008."[4] In response, Defendant's agent wrote the September 2008 Letter which stated that there was an "unambiguous exclusion contained in the Umbrella Policy for any claims caused by any dishonest, fraudulent, or criminal acts committed by Plaintiff" and therefore denies coverage for claims related to the Consumer Claimants. Defendant asserts that its agent denied paying claims that were clearly not covered under the terms of the various insurance policies with Plaintiff.

---

2. The Court has not yet considered whether Plaintiff is entitled to a jury trial on some or all of the causes of action or where such a proceeding will be conducted.

3. The GSA is explained and discussed in further detail below.

4. The letter giving notice of the claims is not in the Court's record and was not presented to the Court at the hearing.

Defendant's Answer states that some of the underlying Consumer Claimants asserted claims that are within the Statute and Title E & O coverage ("STE & O") as defined in the insurance policies. Defendant states that a full defense has been provided under the coverage part for STE & O, subject to a full reservation of rights, and that any remaining coverage under the STE & O has been tendered by Defendant on behalf of Plaintiff as a contribution per the GSA.

Defendant's answer speaks of and quotes from a document apparently titled "Umbrella Unicover Coverage Part 980" and states that the Consumer Claimants' asserted claims are not covered per the language of that document.

Defendant's Counterclaim asserts that "Plaintiff entered into multiple coverage insurance policies with ... [Defendant]. Each Coverage Part constituted a separate contract of insurance, all contained in one folder. These contracts provide—subject to their definitions, conditions, terms, and exclusions, various types of insurance coverage. The policy number is 273515, and the policy periods are November 1, 2006 to November 1, 2007, and November 1, 2007 to November 1, 2008."

Defendant states that "several hundred Complaints have been filed against Plaintiff" by the Consumer Claimants. Some were filed in state court, some claims have been asserted in the bankruptcy case, and other claims of Consumer Claimants have been presented informally. These claims were forwarded to Defendant with Plaintiff demanding that Defendant defend and indemnify Plaintiff under some or all of the insurance contracts. Defendant asserts that the Consumer Claimants alleged an intentional fraudulent advertising scheme on the part of the Plaintiff. Defendant informed Plaintiff that it would provide a defense under a full reservation of rights.

Defendant states that there is no coverage under the contracts for the alleged conduct. Defendant states that in an attempt to settle disputes involving any obligations Defendant may have to Plaintiff and others involved in this bankruptcy case as a result of the policies, Defendant participated in the GSA by contributing funds to a chapter 11 plan in exchange for certain releases, and further alleges that the GSA's terms have been materially altered by the plan confirmation process since that document was executed.

The Defendant asks the Court for a declaratory judgment determining its rights and obligations, if any, under the insurance contracts.

### Additional Facts and Procedural History

To resolve this matter, additional relevant facts were gleaned from the Court's official records in this case and the underlying bankruptcy case. Plaintiff Joe Gibson's Auto World, Inc., ("Plaintiff") filed for Chapter 11 bankruptcy protection on July 16, 2008.

Although that case remained on the Court's docket as a Chapter 11 proceeding, operating assets were sold or relinquished with Court permission shortly after filing and the Plaintiff's business operations ceased.

The bankruptcy schedules list hundreds of Consumer Claimants asserting claims against Plaintiff and disclose numerous lawsuits initiated by some of those Consumer Claimants pre-petition. The schedules also list other potential Consumer Claimants, some that had not yet asserted any formal claim at the time the case was filed. The claims involve allegations of fraud and deception by Plaintiff and others in advertising vehicles for sale to the Consumer Claimants and resulting damages.

There are more than 70 adversaries pending in this Court associated with the

Chapter 11 case. Most result from lawsuits that were pending on the petition date, subsequently removed to this Court by one of the named defendants in those actions. The lawsuits generally involve a Consumer Claimant as plaintiff seeking recovery from a combination of some or all of the parties included in the following list: the Plaintiff in this adversary; Joe Gibson Automotive, Inc, a related company and debtor in bankruptcy case 08–04216, which is also pending in this court; Joe Gibson, individually, as owner of an automotive dealership (d/b/a) and other companies related to him; American Suzuki Motor Corporation, Inc., as supplier of the automobiles and alleged to be a supplier/supporter of advertising training and/or advice that led to the alleged damages; and a lender that financed the Consumer Claimant's purchase of an automobile involved in the factual allegations. Many of the removed lawsuits do not include the Plaintiff herein as a party. Hundreds of Consumer Claimants also filed claims in the bankruptcy case asking Plaintiff to reimburse them for damages suffered as a result of the type of conduct alleged in the lawsuits.

On February 23, 2009, the above captioned debtor filed its first plan. That plan incorporated the GSA dated February 19, 2009. That GSA was a settlement negotiated to provide compensation to the Consumer Claimants participating in this case in exchange for certain releases to participating parties, including Defendant. The GSA was essentially an outline of an unconventional, consensual plan. The GSA included not only monetary relief but also contained options for the return of vehicles, credit repair, and other non-monetary features beneficial to the Consumer Claimants. Defendant contributed to the mone-

tary portion of the GSA as a result of its relationship with Plaintiff created by some or all of the insurance contracts.

The debtors amended the plan a final time on May 22, 2009. On June 29, 2009, this Court confirmed the amended plan, which incorporated the GSA, as amended by consent on May 14, 2009. The plan was confirmed over the objection of this Defendant. Defendant, Plaintiff and others disagreed about the interpretation of the terms of the GSA and Plan, and Defendant claimed that the proposed plan attempted to alter the GSA. The confirmation order noted the following:

> The record indicates overwhelming support for the Plans by consumers and participating parties and sufficient acceptances to confirm the Plans. The Debtors presented ... uncontroverted evidence indicating that the Plans meet the requirements of 11 U.S.C. § 1129 ... Universal/Zurich signed the GSA and asserts, along with the Debtors, that the terms of the GSA are unambiguous and should be the terms of the Plans. However, Universal/Zurich disagrees with other parties to the GSA regarding the interpretation of some of those unambiguous terms ... The GSA is a contract that the Debtors have placed before the Court for approval if the Plans are confirmed. To the extent that the Court's approval is necessary to confirm the Plans, the GSA is approved .... [t]o the extent there is any conflict, the terms and conditions of the GSA shall govern.

The ultimate beneficiaries of this adversary are defined by the confirmed plan in classes 7 and 8. Class 7 provides: [5]

> These parties will share in the distribution made to the Unsecured Trade Creditors in Class 5. Parties in this class

**5.** "Universal" refers to Defendant herein and "Universal Action" to this adversary. *See* footnote 1.

will also share *pro rata* with the Class 8 claimants in the first $400, 000 of the Universal Action Recoveries. Class 7 parties *"pro rata"* share will be calculated after those parties have filed a Special Claims Form, or the Debtor has estimated those claims. Any amounts above $400, 000 will be shared *pro rata* with the Universal Action Beneficiaries, which includes Class 7 claimants, Class 8 claimants, ASMC and any Participating Lenders with Indemnification Claims. Any recovery from the Universal Action Recoveries is uncertain and the precise recovery, if any, available to the parties who submit a Special Claim Form cannot be determined after until the Universal Action is fully resolved. Any amounts that maybe recovered under the Retained Coverage policy will be reduced by the costs associated with pursuing the Universal Action.

Class 8 provides in part as follows:

Parties in Class 8 will share *pro rata* with the Class 7 claimants in the first $400, 000 of any monies received from the Universal Action recoveries. The *"pro rata"* share will only be determined after the Class 8 claimants have filed their Special Action Form, or after the Debtor has estimated their claims. Any amounts above $400, 000 will be shared *pro rata* with the Universal Action Beneficiaries, which includes Class 7 claimants, Class 8 claimants, ASMC and any Participating Lenders with Indemnification Claims. Any possible recovery from the Universal Action Recoveries is uncertain and the precise recovery, if any, available to the parties who submit a Special Claim Form cannot be determined after until the Universal Action is fully resolved. Any monies that maybe received from the Universal Action Recovery will be reduced by the costs associated with pur-

suing the Universal Action and the Universal Action Beneficiaries will split these expenses equally.

From the motions, arguments and briefs of the parties in this matter it appears that Plaintiff and Defendant do not agree as to whether the causes of action asserted in this lawsuit arose before or after the bankruptcy was filed. Plaintiff asserts that it was aware of the causes of action when it received the September 2008 Letter. Defendant alleges that Plaintiff should have known that it had a cause of action the first time Plaintiff received any expression of a reservation of rights in response to a claim notification. Defendant provided the Court with a reservation of rights letter dated September 18, 2007, addressed to and involving Joe Gibson Auto World, Inc., naming two individuals that had filed suit in the Circuit Court of the County of Spartanburg, South Carolina. The letter does not mention a policy number. The parties agreed that there would have been numerous letters such as this for various lawsuits filed pre-petition. Similarly situated Consumer Claimants filed claims in this Court and are included in the plan, even if they did not file a lawsuit prior to the imposition of the automatic stay of 11 U.S.C. § 362 by the filing of the bankruptcy case.

From arguments made at the confirmation hearing and subsequent hearings before the Court it is clear that interpretation of the confirmed plan and GSA will be necessary to finally resolve this adversary proceeding and complete distribution under the plan.

### Discussion and Conclusions of Law

28 U.S.C. 157(b)(3) provides that "[t]he bankruptcy judge shall determine, on the judge's own motion or on timely motion of a party, whether a proceeding is a core proceeding under this subsection or is a proceeding that is otherwise related to a case under title 11." [6] Section 157(b)(2)

---

**6.** This history of bankruptcy court jurisdiction and the evolution of the core/non-core deter-

provides that core proceedings include, but are not limited to—

> (A) matters concerning the administration of the estate;
>
> (E) orders to turn over property of the estate;
>
> (O) other proceedings affecting the liquidation of the assets of the estate or the adjustment of the debtor-creditor or the equity security holder relationship, except personal injury tort or wrongful death claims.

"The distinction between what is 'core' and what is 'non-core' is far from clear." *Vieira v. AGM, II, LLC,* 366 B.R. 532, 539 (D.S.C.2007). Previous decisions from bankruptcy courts within this district have embraced a broad definition of core proceedings under § 157(b):

> Several Circuits have held that core proceedings be given an expansively broad interpretation. *See In re Johnson,* 960 F.2d 396, 401 (4th Cir.1992) ("Many courts construe the term 'core proceedings' quite broadly. Indeed, the ambiguity in § 157(b)(2) invites such interpretation with such broadly inclusive language that encompasses proceedings 'affecting the liquidation of assets of the estate' and matters 'concerning the administration of the estate.'" 28 U.S.C. § 157(b)(2)(A),(O).); *In re Arnold Print Works, Inc.,* 815 F.2d 165, 168 (1st Cir. 1987) (stating that legislative history "indicates that Congress intended that 'core proceedings' would be interpreted broadly, close to or congruent with constitutional limits. The sponsors [of § 157] repeatedly said that 95 percent of the proceedings brought before bankruptcy judges would be core proceedings.") (citing 130 Cong. Rec. E1108–E1110 (daily ed. March 20, 1984) (statement of Representative Kastenmeier);

*Id.* at EH1848, H1850 (daily ed. March 21, 1984) (statement of Representative Kindness)); *In re Mankin,* 823 F.2d 1296, 1301 (9th Cir.1987) ("Nothing in the legislative history of § 157(b) suggests that Congress enumerated examples of core proceedings in § 157(b) with anything but a view toward expanding the bankruptcy court's jurisdiction to its constitutional limit.").

*In re TJN, Inc.,* 207 B.R. 502, 508 (Bankr. D.S.C.1996).

 Non-core proceedings consist of proceedings filed in bankruptcy court: (1) that are not listed as a core proceeding under § 157(b)(2)(B) through (N), (2) that existed before the bankruptcy case was filed; (3) that exist independent of Title 11, and (4) in which the parties' rights and/or obligations are not significantly affected by the bankruptcy filing. In re *Hughes–Bechtol, Inc.,* 107 B.R. 552, 556 (Bankr. S.D.Ohio 1989). Defendant argues that this is an action that arose pre-petition involving state law contract issues and that the right to have coverage determined under the policy exists independent of the provisions of Title 11. Defendant asserts that the rights and obligations of the parties are determined by the insurance contracts and are not significantly affected by this bankruptcy case. Such an action is not listed as a core matter in § 157(b)(2)(B) through (N).

Plaintiff argues that the action arose post-petition and involves matters that are essential to the administration and conclusion of this bankruptcy. *See, In re United States Lines, Inc.,* 197 F.3d 631, 638–639 (2d Cir.1999) (The most important asset of a debtor's estate may consist of "[i]ndemnity insurance contracts, particularly where the debtor is faced with substantial

---

mination will not be repeated here. *See* 9 Am.Jur.2d Bankruptcy § 752; *see also N. Pipeline Constr. Co. v. Marathon Pipe Line Co.,*

458 U.S. 50, 102 S.Ct. 2858, 73 L.Ed.2d 598 (U.S.1982).

liability claims within the coverage of the policy. . . ." Proceedings involving such contracts may be core, especially if necessary to assist in creating "an equitable distribution of the bankruptcy estate," which has a direct affect on a "bankruptcy court's core administrative function of asset allocation among creditors.")

The pre-petition insurance contracts, the injuries to Consumer Litigants, and various denials of coverage existed before the bankruptcy case was filed. Defendant's final, global denial of coverage, which would affect all remaining Consumer Claimants, creditors or potential creditors of this bankruptcy estate, occurred post-petition with the September 2008 letter. It appears that the causes of action arose both pre and post-petition.

Plaintiff's claims under the original insurance contracts asserted herein could exist even if this bankruptcy case had never been filed. However, post-petition the GSA was executed by and between not only Plaintiff, Defendant and the Consumer Litigants, but also other parties that contributed to and benefitted from the plan confirmation process. That GSA and plan created a new, post-petition contract that altered the rights and responsibilities of Plaintiff and Defendant under the pre-petition insurance contracts as part of the plan confirmation process unique to Chapter 11. Interpretation of the pre-petition insurance contracts and the post-petition GSA and plan is now necessary to determine what, if anything, is due to the estate from Defendant to achieve an equitable distribution of the remaining assets of this estate to classes 7 and 8. The GSA defined and realigned the debtor/creditor relationship among hundreds of parties, including Plaintiff and Defendant, and is irrevocably entwined with the resolution of this adversary.

▆▆▆ Courts dealing with the issue of whether actions involving contracts qualify as core proceedings have focused on "whether the contract is antecedent to the reorganization petition; and . . . the degree to which the proceeding is independent of the reorganization." *U.S. Lines,* 197 F.3d at 637. "The latter inquiry hinges on 'the nature of the proceeding.'" *Id.* In other words, a bankruptcy proceeding may be core by nature if it "is unique to or uniquely affected by the bankruptcy proceedings" or if "the proceedings directly affect a core bankruptcy function. . . ." *Id.*

This chapter 11 case has been unconventional and this adversary is likewise unusual. Although the adversary began with pre-petition facts and contracts that are independent of the bankruptcy, it has since evolved to include essential post-petition events and law unique to Title 11 and the adjustment of debtor/creditor relationships by the plan confirmation process.

**IT THEREFORE ORDERED:**

That the matters presented to the Court in this adversary case are core proceedings as defined in 28 U.S.C. § 157(b)(2)(O).